# United States Court of Appeals
## For the First Circuit

Nos. 20-1373, 20-1379

MELODY CUNNINGHAM, individually and on behalf of all others
similarly situated; FRUNWI MANCHO, individually and on behalf of
all others similarly situated,

Plaintiffs, Appellees/Cross-Appellants,

MARTIN EL KOUSSA, individually and on behalf of all others
similarly situated; VLADIMIR LEONIDAS, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

LYFT, INC.; LOGAN GREEN; JOHN ZIMMER,

Defendants, Appellants/Cross-Appellees.

Nos. 20-1544, 20-1549, 20-1567

MELODY CUNNINGHAM, individually and on behalf of all others
similarly situated; FRUNWI MANCHO, individually and on behalf of
all others similarly situated; MARTIN EL KOUSSA,
individually and on behalf of all others similarly
situated; VLADIMIR LEONIDAS, individually and on behalf
of all others similarly situated,

Plaintiffs, Appellees/Cross-Appellants,

v.

LYFT, INC.; LOGAN GREEN; JOHN ZIMMER,

Defendants, Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

─────────────

Before

Lynch and Kayatta, Circuit Judges,
and McElroy,* District Judge.

─────────────

Elaine J. Goldenberg, with whom Jeffrey Y. Wu, Benjamin G. Barokh, Donald B. Verrilli, Jr., Rachel G. Miller-Ziegler, Rohit K. Singla, Justin P. Raphael, Adele M. El-Khouri, Munger, Tolles & Olson LLP, James D. Smeallie, David J. Santeusanio, Andrew E. Silvia, Michael T. Maroney, and Holland & Knight LLP were on brief for appellants.
Ben Robbins and Martin J. Newhouse on brief for New England Legal Foundation, amicus curiae.
Steven P. Lehotsky, U.S. Chamber Litigation Center, Inc., Archis A. Parasharami, and Mayer Brown LLP on brief for Chamber of Commerce of the United States of America, amicus curiae.
Shannon Liss-Riordan, with whom Anastasia Doherty, Adelaide H. Pagano, Anne R. Kramer, and Lichten & Liss-Riordan, P.C. were on brief for appellees.
Hugh Baran on brief for National Employment Law Project, Massachusetts Coalition for Occupational Safety and Health, Justice at Work, and New York Taxi Workers Alliance, amici curiae.

─────────────

November 5, 2021

─────────────

─────────────

\* Of the District of Rhode Island, sitting by designation.

**KAYATTA**, **Circuit Judge**.  Plaintiffs are Massachusetts-based rideshare drivers who use the Lyft application and platform to find passengers.  Plaintiffs claim that Lyft misclassifies them as independent contractors, rather than employees.  They seek relief on their own behalf and on behalf of other drivers who worked for Lyft in Massachusetts, although a class has not been certified.

The parties joined issue in a flurry of motions leading to rulings concerning plaintiffs' requests for preliminary injunctive relief and Lyft's request to compel arbitration.  Lyft now presses an interlocutory appeal from the denial of its motion to compel arbitration, while plaintiffs press interlocutory cross-appeals from the denial of requests for preliminary injunctive relief, including a so-called "public injunction."[1]  For the following reasons, we reverse the order denying Lyft's motion to compel arbitration, and affirm the denials of preliminary injunctive relief.

## I.

Lyft, Inc., a ridesharing company, uses a smartphone application to allow customers to hail drivers.  Cunningham v. Lyft, 450 F. Supp. 3d 37, 39 (D. Mass. 2020).  In order to work

---

[1] Lyft also appealed the order denying the "public injunction" request, to preserve the argument that the order should be vacated for lack of jurisdiction due to the pendency of Lyft's earlier appeal.

for Lyft as a driver, "an individual must register, download the application, and agree to Lyft's Terms of Service." Id. The Terms of Service spell out how a driver qualifies to use the platform to connect with riders and how fares are set, collected, and apportioned. See Cunningham v. Lyft, No. 1:19-cv-11974-IT, 2020 WL 2616302, at *6 (D. Mass. May 22, 2020).

Lyft considers its drivers "independent contractors" and does not provide them with sick leave benefits. Id. Although drivers may drive as much or as little as they want, and may also reject ride requests, Lyft retains the right to deactivate drivers who violate the Terms of Service or fall below Lyft's "star rating or cancellation threshold." Id.

In 2018, Lyft updated its Terms of Service. Drivers could not continue using Lyft to pick up riders until they signaled their acceptance of the updated Terms of Service by clicking the "I accept" button. Cunningham, 450 F. Supp. 3d at 39. Those revised terms stated, in relevant part, that "[t]hese provisions will, with limited exception, require you to submit claims you have against Lyft to binding and final arbitration on an individual basis, not as a plaintiff or class member . . . As a driver or driver applicant, you have an opportunity to opt out of arbitration with respect to certain claims." Id. at 39-40 (capitalization altered). Drivers could also follow a hyperlink directly to the

- 4 -

section in the updated Terms of Service containing the arbitration provision.  That section states in relevant part:

> YOU AND LYFT MUTUALLY AGREE TO WAIVE OUR RESPECTIVE RIGHTS TO RESOLUTION OF DISPUTES IN A COURT OF LAW BY A JUDGE OR JURY AND AGREE TO RESOLVE ANY DISPUTE BY ARBITRATION, as set forth below.  This agreement to arbitrate ("Arbitration Agreement") is governed by the Federal Arbitration Act . . . ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED.  Except as expressly provided below, this Arbitration Agreement applies to all claims (defined below) between you and Lyft, including our affiliates, subsidiaries, parents, successors, and assigns, and each of our respective officers, directors, employees, agents, or shareholders . . . .  Except as expressly provided below, ALL DISPUTES AND CLAIMS BETWEEN US . . . SHALL BE EXCLUSIVELY RESOLVED BY BINDING ARBITRATION SOLELY BETWEEN YOU AND LYFT.  These claims include but are not limited to any dispute, claim, or controversy, whether based on past, present, or future events, arising out of or relating to:  this Agreement and prior versions thereof . . . the Lyft Platform, the Services, any other goods or services made available through the Lyft Platform, your relationship with Lyft . . . state or federal wage-hour law . . . .

Id. at 40 (alterations in original).  The agreement also includes a "Prohibition of Class Actions and Non-Individualized Relief." Id.[2]  Finally, the agreement provides that "disputes regarding the

---

[2]  This prohibition reads:

> YOU UNDERSTAND AND AGREE THAT YOU AND LYFT MAY EACH BRING CLAIMS IN ARBITRATION AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT

scope, applicability[,] enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator." Id. at 40-41.

Plaintiff Melody Cunningham has been driving for Lyft since June 2013. Plaintiff Frunwi Mancho has been driving for Lyft since January 2016. Both clicked the "I accept" button on the updated Terms of Service in 2018 and neither opted out of the arbitration agreement. Id. at 41. Both Mancho and Cunningham used the Lyft platform to pick up passengers, some of whom were traveling to or from Logan Airport in Boston, Massachusetts. Id.

---

ON A CLASS, COLLECTIVE ACTION, OR REPRESENTATIVE BASIS ("CLASS ACTION WAIVER"). YOU UNDERSTAND AND AGREE THAT YOU AND LYFT BOTH ARE WAIVING THE RIGHT TO PURSUE OR HAVE A DISPUTE RESOLVED AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, COLLECTIVE OR REPRESENTATIVE PROCEEDING ...

The arbitrator shall have no authority to consider or resolve any Claim or issue any relief on any basis other than an individual basis. The arbitrator shall have no authority to consider or resolve any Claim or issue any relief on a class, collective, or representative basis. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claims.

Cunningham, 450 F. Supp. 3d at 40 (alteration in original).

at 41.  Mancho also occasionally drove passengers across state lines, including from Haverhill, Massachusetts to Salem, New Hampshire, and from Logan Airport to Portsmouth, New Hampshire. Cunningham did not drive any passengers across state lines.  Id.

Lyft contends that nation-wide, "approximately 98% of rides provided by drivers using Lyft and similar ridesharing platforms take place entirely within the boundaries of a single state."  From September 17, 2016 to April 7, 2020, "fewer than 2% of all [rides given by drivers for Lyft] in the United States crossed state lines.  And during that same period, fewer than 0.5% of rides on the Lyft platform that began in Massachusetts crossed state lines.  Instead, those rides were short and localized."  In 2018, for example, "on average, drivers using rideshare platforms in Massachusetts gave rides that lasted under 16 minutes and traveled fewer than 5 miles."  Interstate travel by drivers who use the competing Uber platform is similarly rare, as "only 2.5% of all trips fulfilled using the Uber Rides marketplace in the United States between 2015 and 2019 . . . started and ended in different states."  Capriole v. Uber Techs., Inc., 7 F.4th 854, 864 (9th Cir. 2021)(internal quotation marks omitted).

Plaintiffs do not quibble with Lyft's numbers.  Instead, they train their focus primarily on a different set of numbers, based on trips to and from Logan Airport.  Plaintiffs assert that Lyft and Uber "represent about 40% of the traffic at Logan Airport

during peak times" and "provide literally millions of rides to and from Logan airport every year."  Plaintiffs add that "[a] whopping 62% of Massachusetts Lyft riders have used Lyft to get to the airport."

## II.

We first address the issue of compulsory arbitration. The parties agree that the Federal Arbitration Act (FAA) applies unless plaintiffs fit within an exemption for "a class of workers engaged in foreign or interstate commerce."  Our review of this issue is de novo.  Barbosa v. Midland Credit Mgmt., Inc., 981 F.3d 82, 86 (1st Cir. 2020).

## A.

The FAA was enacted in 1925 "in response to a perception that courts were unduly hostile to arbitration."  Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1621 (2018).  The FAA establishes "a liberal federal policy favoring arbitration" and reflects "the fundamental principle that arbitration is a matter of contract."  AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted).  It also requires courts to "place arbitration agreements on an equal footing with other contracts" and "enforce them according to their terms."  Id.

Central to this appeal is section 1 of the FAA. Section 1 "exempts employment contracts of certain categories of workers from the Act's coverage."  Waithaka v. Amazon.com, Inc.,

966 F.3d 10, 16 (1st Cir. 2020), cert. denied, 141 S. Ct. 2794 (2021), reh'g denied, 141 S. Ct. 2886 (2021). Specifically, section 1 provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Court has referred to the phrase "any other class of workers engaged in . . . commerce" as a "residual phrase." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114 (2001).

In Circuit City, the Court rejected the contention that the residual phrase covered all employees arguably involved in commerce. Instead, it read the residual phrase as covering only "transportation" workers. Id. at 119 ("Section 1 exempts from the FAA only contracts of employment of transportation workers.")

No party to this case contends that the contracts at issue here are not "contracts of employment of transportation workers."[3] Pointing to the fact that the Supreme Court in Circuit City referred to the movement of goods, Lyft does contend that because Lyft drivers generally transport persons, not goods, the residual phrase does not encompass them. But see Waithaka, 966

---

[3] The Supreme Court has held that section 1 applies to "agreements to perform work," including those of independent contractors. New Prime Inc. v. Oliveira, 139 S. Ct. 532, 544 (2019). Accordingly, the distinction between employees and independent contractors matters not for the threshold question of the FAA's applicability, regardless of its centrality to the underlying dispute. See Waithaka, 966 F.3d at 17.

F.3d at 13 (workers "who transport goods or people"); see also Saxon v. Sw. Airlines Co., 993 F.3d 492, 497 (7th Cir. 2021)(accepting that "the movement of goods accompanying people, just as much as the movement of goods alone," constituted interstate commerce for § 1, where the defendant had abandoned the contrary argument on appeal); Singh v. Uber Techs Inc., 939 F.3d 210, 226 (3d Cir. 2019) (holding that § 1 exempts employment contracts for "all classes of transportation workers" engaged in interstate commerce). As it turns out, we need not address this contention. Rather, we turn our attention to Lyft's principal contention that these transportation workers are not among a class of transportation workers who are "engaged in . . . interstate commerce" within the meaning of section 1. Plaintiffs do not challenge the premise that they must be among such a class of transportation workers in order to claim the benefit of the exemption. Instead, they claim that members of the class of transportation workers to which they belong are engaged in interstate commerce for two reasons: (1) Because they take passengers to and from Logan Airport for trips to and from other states and countries; and (2) Because some Lyft drivers sometimes take fares across state lines. We address each argument in turn.

**1.**

Plaintiffs' argument based on their transportation of some passengers to and from Logan Airport runs headlong into the

instruction supplied by United States v. Yellow Cab Co., 332 U.S. 218 (1947), overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 759-60, 777 (1984). The Supreme Court in Yellow Cab considered whether interstate commerce sufficient to bring the Sherman Antitrust Act into play was present in two different scenarios involving taxi service.

The first scenario involved the transfer of passengers and their luggage between rail stations in Chicago. Id. at 228. At the time, most passengers traveling interstate by rail through Chicago were required to disembark from a train at one station and travel up to two miles to board another train at another station to continue their interstate journey. Id. The railroads often agreed with their passengers to provide transit between the two stations. Id. The railroads then contracted with cab companies to supply the vehicles and drivers for this connecting transit. Id. at 229.

The second scenario involved taxi cabs in the course of their normal local taxi service throughout Chicago arranging with passengers to drive them to or from various locations, including the rail stations at the beginning or end of their rail journeys. Id. at 230.

The Supreme Court held that the transfer by motor vehicles in the first scenario sufficiently implicated interstate commerce as to make the Sherman Act applicable. Id. at 229. This

made common sense: The typical passenger undoubtedly viewed his or her trip as one interstate journey, with the mid journey transfer smack within the flow of that trip. Accord Waithaka, 966 F.3d at 22 (finding that transportation workers responsible for only an intrastate leg of an integrated, interstate journey were nonetheless understood to be "engaged in interstate commerce" when the FAA was passed in 1925).

As to the second scenario, however, the Court held that "when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation." Yellow Cab, 966 F.3d at 233. Rather, the interstate journey begins when the passenger "boards the train at the station and ends when he disembarks at the station in the city of destination." Id. at 231. "To the taxicab driver, it is just another local fare." Id. at 232.

The trips by Lyft drivers to and from Logan fit well the second Yellow Cab scenario. The Lyft driver contracts with the passenger as part of the driver's normal local service to take the passenger to the start (or from the finish) of the passenger's interstate journey. See Capriole, 7 F.4th at 863-64 (finding that rideshare drivers who take fares to an airport "are less like the exclusive provider of 'between-station transportation' described

in Yellow Cab and more like a 'local taxicab service.'" (quoting 332 U.S. at 228, 233)).

Conversely, the trips by Lyft drivers to and from Logan fit poorly the first Yellow Cab scenario.  The airlines do not agree to provide the relevant ground transit, and based on the record before us, neither Lyft nor Lyft drivers contract with the airlines to help the airlines perform such an undertaking.

We are confident that a scenario not affecting "interstate commerce" under the Sherman Act would also not qualify as a scenario in which taxicabs would be "engaged in . . . interstate commerce" under section 1 of the FAA.  The Sherman Act bars "unreasonable restraints on interstate commerce, regardless of the amount of commerce affected."  Yellow Cab, 332 U.S. at 225. The Act is broadly construed, see id. at 226, whereas the FAA exception at issue here is narrowly construed, Circuit City, 532 U.S. at 118.  Hence, conduct that does not affect interstate commerce under the Sherman Act (e.g., local cab rides to the station) would seem a fortiori not to be conduct "engaged in interstate commerce" under the FAA's section 1 exception.

Plaintiffs seek to distinguish Yellow Cab by pointing out that the dropping off and picking up of passengers at Logan is regulated by the Massachusetts Port Authority, rather than a purely local entity.  But nothing in Yellow Cab even hints that the

presence or source of traffic regulation at the point of drop-off or pick-up bears on the interstate inquiry.

Drawing a line between the interstate transportation provided by the airlines and the local intrastate transportation provided by Lyft drivers makes sense when defining the nature of activity in which plaintiffs are engaged. One would not reasonably say that plaintiffs are engaged in interstate trucking merely because they sometimes give truck drivers rides to and from their garages. Similarly, we do not think that plaintiffs are engaged in interstate travel merely because they bring passengers to and from an airport.

Our decision in Waithaka is not to the contrary. There Amazon (like the railroads in Yellow Cab) agreed with Amazon customers to transport goods interstate from their point of origin to the customer's home. See 966 F.3d at 13–14. The local delivery drivers (like the taxi companies in the first scenario of Yellow Cab) then agreed with Amazon to carry the goods for a portion of that single interstate journey ("the so-called 'last mile'"). Id. Here, by contrast, there is no evidence of any such agreements between Lyft and the airlines.

Plaintiffs' only other argument for distinguishing the local taxicab scenario in Yellow Cab from the Logan trips taken by Lyft drivers rests on an assertion that "Lyft has formed partnerships with airlines in which airlines promote its service

- 14 -

and sometimes even issue credits toward a Lyft ride." But no evidence of any such partnerships nor any argument to this effect was presented in the district court. See United States v. Muriel-Cruz, 412 F.3d 9, 12 (1st Cir. 2005) (limiting appellate review to the "record extant at the time the district court rendered its decision."). Nor for that matter do plaintiffs even attempt to show how these partnerships are analogous to the exclusive arrangements made between railroads and taxi companies in Yellow Cab.[4]

**2.**

We turn next to plaintiffs' alternative argument that they fit within the section 1 exemption because some of them occasionally transport passengers across state lines. We need not decide how to treat a lawsuit arising out of one of these rare interstate trips. Nor need we decide whether any particular Lyft driver engages in interstate commerce. Rather, our task under the FAA is to decide whether relatively rare (but nevertheless

---

[4] The Ninth Circuit recently addressed a similar argument "raised for the first time on appeal," concerning airline marketing promotions and ride credits for Uber's ridesharing service. See Capriole, 7 F.4th at 865. Plaintiffs here have acknowledged the nature of the Uber promotions presented in that case and that "[t]he same is true here with Lyft." But the Capriole court found that "nothing about the submitted [airline advertisements] indicates the type of commercial relationship described in Yellow Cab." Id. While we do not have any such materials in the record here, Capriole makes plain, at the least, that such agreements would not necessarily be dispositive.

numerically many) interstate trips make Lyft rideshare drivers a "class of workers engaged in . . . interstate commerce." 9 U.S.C. § 1. Yellow Cab does not directly answer this question because the taxicab drivers in that case never claimed to cross state lines. 332 U.S. at 230-31.

Lyft contends that plaintiffs are not a class of workers engaged in interstate commerce under section 1 because not all of them ever cross state lines and those who do only do so relatively infrequently. One of the four named plaintiffs in this very case, who are all said to be typical of the putative class members, never took a fare across state lines in five years of driving for Lyft, and fewer than 2% of Lyft rides nationwide cross state lines. So the question posed is this: Does a class of workers qualify under section 1 if many but not all of the workers cross states lines on a very small percentage of their trips?

The two circuits who have considered this question reached opposite results. In International Brotherhood Of Teamsters Local Union No. 50 v. Kienstra Precast, Inc., 702 F.3d 954, 958 (7th Cir. 2012), the Seventh Circuit held that cement truck drivers whose local trips took them across state lines on roughly two percent of their delivery trips were within the ambit of the section 1 exemption. Reasoned the court, "there is no basis in the text of § 1 for drawing a line between workers who do a lot of interstate transportation work and those who cross state lines

- 16 -

only rarely; both sorts of workers are 'engaged in foreign or interstate commerce.'" Id. Conversely, the Ninth Circuit recently concluded that Uber drivers are not among a class of workers who engaged in interstate commerce notwithstanding that 2.5% of Uber rides cross state lines. Capriole, 7 F.4th at 863. The court reasoned that driving passengers interstate was not a "central part of the job description," and that "someone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work." Id. at 865 (quoting Wallace v. Grubhub Holdings, Inc., 970 F.3d 798, 800, 803 (7th Cir. 2020)).

As an abstract matter, one might argue that a person whose job primarily involves intrastate transportation but also, albeit infrequently, requires interstate transportation might be engaged in both types of transportation. Nonetheless, for several reasons we conclude that Lyft drivers are not a class of workers engaged in interstate commerce.

First, not all Lyft drivers engage in any interstate transportation. The lead plaintiff, Ms. Cunningham, has in five years of working as a Lyft driver never taken a passenger across state lines. So the "class of workers" as a whole is not engaged in interstate commerce at all. That being said, we also expect that some workers on passenger railroads may handle only within-state trips. So we do not rely on this fact alone.

More significantly, Circuit City instructs that the "§ 1 exclusion provision [must] be afforded a narrow construction," 532 U.S. at 118, and that we must construe the general language of the residual phrase "to embrace only objects similar in nature to those objects enumerated by the preceding specific words," id. at 115. In section 1, those enumerated objects are "seamen" and "railroad employees," two classes of transportation workers primarily devoted to the movement of goods and people beyond state boundaries. The same cannot even arguably be said of Lyft drivers.

Third, in Waithaka, we noted that "[t]he nature of the business for which a class of workers perform their activities must inform [our] assessment" of "whether a class of workers is 'engaged in . . . interstate commerce.'" Waithaka, 966 F.3d at 22 (quoting 9 U.S.C. § 1). Lyft is clearly primarily in the business of facilitating local, intrastate trips.[5]

For all of these reasons, collectively, we conclude that Lyft drivers are not among a class of transportation workers engaged in interstate commerce within the meaning of section 1 as narrowly construed. They are among a class of workers engaged primarily in local intrastate transportation, some of whom

---

[5] Given the similarity between the numbers Lyft cites for Massachusetts and national Lyft drivers, we need not decide at this juncture whether we are considering only Lyft drivers in Massachusetts or whether we are considering all Lyft drivers across the country. Regardless of the sample population, the percentage of interstate trips is miniscule.

infrequently find themselves crossing state lines, and are thus fundamentally unlike seamen and railroad employees when it comes to their engagement in interstate commerce.

**B.**

Because we find that the FAA applies, we need not examine the role of the Massachusetts Uniform Arbitration Act. See Smith Barney, Inc. v. Critical Health Sys. of N.C., Inc. of Raleigh, N.C., 212 F.3d 858, 860-61 (4th Cir. 2000) ("Once a dispute is covered by the [FAA], federal law applies to all questions of interpretation, construction, validity, revocability, and enforceability." (alteration in original) (quoting In re Salomon Inc. S'holders' Derivative Litig., 68 F.3d 554, 559 (2d Cir. 1995))).

**III.**

Thinking that this case would remain in the district court rather than be rerouted to arbitration, the district court entertained and denied plaintiffs' requests for a preliminary injunction. Now that we have determined that the FAA applies, it is clear that the dispute between these parties will be for the arbitrator to decide. In normal course, that would be the end of it, and we would not need to consider the merits of plaintiffs' appeal from the denial of their injunctive requests. See Next Step Med. Co., Inc. v. Johnson & Johnson Int'l, 619 F.3d 67, 70 (1st Cir. 2010) (holding that the decision to arbitrate the entire

case typically supersedes the need to decide on injunctive relief). Next Step, however, acknowledged limited qualifications to this general rule, including that a district court may issue "an interim preliminary injunction" to address a "short-term emergency" in the period before "the arbitrator is set up and able to offer interim relief itself." 619 F.3d at 70 (emphasis in original). Later the same year, our court reiterated that "[a] preliminary injunction pending arbitration is ordinarily temporary emergency relief that extends only until the arbitrator itself can decide whether to award relief." Braintree Labs., Inc. v. Citigroup Glob. Mkts., Inc., 622 F.3d 36, 40 n.4 (1st Cir. 2010).

Assuming (incorrectly) that arbitration was not required, the district court nevertheless denied plaintiffs' requested injunction, for failure to establish any immediate threat of irreparable injury. Cunningham, 2020 WL 2616302, at *1, *13-14; Cunningham v. Lyft, No. 1:19-cv-11974-IT, 2020 WL 1323103, at *3 (D. Mass. Mar. 20, 2020). Reviewing that denial for legal error or abuse of discretion, Russomano v. Novo Nordisk Inc., 960 F.3d 48, 53 (1st Cir. 2020), we have little to add to that cogent analysis. Plaintiffs offer no actual evidence of any harm to themselves that is of a type considered irreparable by an award of damages. They devote their argument instead to a claim that the public interest calls for an injunction so as to provide higher payments to other Lyft drivers, whose behavior in the absence of

such payments may harm the public.  While the public interest is certainly a factor to be considered in connection with a motion for injunctive relief, see, e.g., Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008), we can hardly say that the denial of such a motion in the absence of a showing of irreparable harm is either legal error or an abuse of discretion. Moreover, plaintiffs have not even moved to certify a class, and they can point to no Massachusetts statute that gives them standing to sue on behalf of other persons not within a certified class. See Brown v. Trs. of Boston Univ., 891 F.2d 337, 361 (1st Cir. 1989) ("Ordinarily, classwide relief . . . is appropriate only where there is a properly certified class.").[6]

---

[6] Plaintiffs point to a California Supreme Court case holding that a California consumer-protection statute provided for "public injunctive relief," a remedy whose "primary purpose and effect" is to "prohibit[] unlawful acts that threaten future injury to the general public."  McGill v. Citibank, N.A., 393 P.3d 85, 86 (Cal. 2017).  While plaintiffs' argument would require us, among other things, to read such a right into the Massachusetts Wage Act for the first time, we need not reach any such issues, because McGill also clarified that even under California law "[r]elief that has the primary purpose or effect of redressing or preventing injury to an individual plaintiff -- or to a group of individuals similarly situated to the plaintiff -- does not constitute public injunctive relief."  Id. at 90 (emphasis added).  This forecloses plaintiffs' remedy under even their argued-for standard, because it is indisputable that the relief sought here is primarily for the proposed class of Lyft rideshare drivers.  Any theory of remedy for plaintiffs' purported public harms requires that the class first receive its direct benefits, with only ancillary benefits to the public that may even require the drivers to exercise discretion for the public good (i.e., choosing to utilize paid sick time to reduce the spread of an illness).

Finally, plaintiffs also contend that the district court ought to have accorded less weight to the irreparable harm prong, under the theory that harm should be measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." See Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). However, plaintiffs direct us to no authority suggesting that this would permit an injunction on a showing of no irreparable harm at all. See Pub. Serv. Co. of N.H. v. Town of W. Newbury, 835 F.2d 380, 383 (1st Cir. 1987) ("Because of our analysis [finding no] irreparable harm, we need not reach the question of likelihood on the merits."). Further, in arguing that a court could properly issue a preliminary injunction in this rare context, plaintiffs themselves point out that "preventing irreparable harm is the animating purpose of interim relief provided pending arbitration." Plaintiffs cannot have it both ways, arguing in one context for a reduced emphasis on irreparable harm while acknowledging that this prong is the "animating purpose" of the very remedy they seek.

## IV.

For the forgoing reasons, the district court's decision denying defendants' motion to compel arbitration is reversed, and the decisions denying plaintiffs' motions for a preliminary injunction are affirmed.