# United States Court of Appeals
## For the First Circuit

No. 22-1015

DAMON IMMEDIATO, STEPHEN LEVINE, and ERIC WICKBERG, on behalf
of themselves and all others similarly situated,

Plaintiffs, Appellants,

v.

POSTMATES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch and Selya, Circuit Judges,
and McElroy,* District Judge.

Shannon Liss-Riordan, with whom Michelle Cassorla and Lichten
& Liss-Riordan, P.C. were on brief, for appellants.
Theane Evangelis, with whom Blaine H. Evanson, Dhananjay S.
Manthripragada, Shaun A. Mathur, Allison L. Mather, and Gibson,
Dunn & Crutcher LLP were on brief, for appellee.

November 29, 2022

_____

* Of the District of Rhode Island, sitting by designation.

**SELYA**, **Circuit Judge**.  This appeal requires us to determine whether couriers who deliver goods from local restaurants and retailers are transportation workers engaged in interstate commerce such that they are exempt from the Federal Arbitration Act (FAA or Act).  See 9 U.S.C. § 1.  The district court concluded that they were not exempt, compelled arbitration of the parties' dispute, and dismissed the appellants' suit.  The appellants assign error:  they insist that our decision in Waithaka v. Amazon.com, Inc., in which we held that Amazon delivery drivers responsible for the final leg of interstate package deliveries were exempt from the FAA, demands a different outcome.  966 F.3d 10, 13 (1st Cir. 2020).

The appellants are comparing plums with pomegranates. Unlike the Amazon delivery drivers in Waithaka, the couriers here are not actively engaged in the interstate transport of goods and, thus, are not within a class of workers exempted from the Act. Accordingly, we affirm the judgment below.

**I**

The genesis of this appeal can be traced back to the district court's grant of the appellee's motion to compel arbitration.  Because the motion to compel was made in conjunction with a motion to stay, "we draw the relevant facts from the operative complaint and the documents submitted to the district

court in support of the motion to compel arbitration." Cullinane v. Uber Techs., Inc., 893 F.3d 53, 55 (1st Cir. 2018).

Defendant-appellee Postmates, Inc. operates an online and mobile platform that enables customers to order take-out meals from local restaurants as well as comestibles and sundries from local grocery stores. Once an order is placed, the appellee arranges — at the customer's behest — for a courier to deliver the order. As relevant here, nearly all orders placed in Massachusetts (99.66%) are fulfilled within the state, and the average distance travelled by a courier during a delivery is about 3.7 miles.

Individuals register as couriers through a mobile application. As part of that registration, they must accept the appellee's "Fleet Agreement," which generally sets forth the rights and obligations of the parties and — in the bargain — classifies couriers as independent contractors. The agreement contains a mutual arbitration provision that is "governed exclusively" by the FAA and applies to "any and all claims" against the appellee. Such claims include those that arise from disputes over the terms of the Fleet Agreement itself, as well as those that sound in federal, state, or local law.

The mutual arbitration provision requires that all such disputes be resolved through final and binding arbitration in accordance with rules set forth by the American Arbitration Association (AAA). The provision also includes a class action

waiver and forecloses the arbitration of representative actions. Couriers may opt out of the mutual arbitration provision within thirty days of accepting the Fleet Agreement but are otherwise bound by its terms.

Plaintiffs-appellants Damon Immediato, Stephen Levine, and Eric Wickberg worked as couriers for the appellee, making deliveries in the greater Boston area. All of them consented to the Fleet Agreement without opting out of the mutual arbitration provision.[1] Ostensibly aggrieved by the conditions under which they worked, they filed suit in a Massachusetts state court on their own behalf and on behalf of a putative class of similarly situated couriers. They alleged that the appellee had misclassified them as independent contractors when they were in fact employees. They further alleged that, as such, they were entitled to employee benefits and protections afforded under Massachusetts law, including the reimbursement of necessary business expenses, the payment of a minimum wage, and paid sick leave.

---

[1] When the appellants began working for the appellee, they each consented to the 2017 version of the Fleet Agreement. The appellee thereafter twice revised the Fleet Agreement (in 2018 and 2019), and the appellants consented to those updated terms. With respect to the parts of the mutual arbitration provision at issue here, there is no material difference between the various iterations of the Fleet Agreement.

The appellee removed the suit to the federal district court, see 28 U.S.C. §§ 1332(d), 1441, 1453, and moved to compel arbitration.[2] The appellants objected, contending that they belonged to a class of workers exempt from the FAA under 9 U.S.C. § 1. The district court ruled that the exemption did not apply, granted the appellee's motion, and stayed the court case pending the completion of arbitration.

In arbitration, the appellee made offers of judgment to the appellants individually. Those offers were accepted. The district court then approved the awards and dismissed the case.

This timely appeal followed. In it, the appellants challenge both the district court's order compelling arbitration and the resultant order of dismissal.

## II

We have jurisdiction to review a district court's "final decision with respect to an arbitration." Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1414 (2019) (quoting 9 U.S.C. § 16(a)(3)). Our review is de novo. See Waithaka, 966 F.3d at 16.

---

[2] The appellants initially filed a demand for arbitration with the AAA, but the AAA refused to take up the demand because the appellee had failed to abide by AAA rules in the past. (It had failed to pay required fees to the AAA when over 10,000 of its couriers simultaneously filed demands for arbitration in February of 2020.) But the AAA later agreed to arbitrate specific disputes, notwithstanding the appellee's previous failure to pay fees, so long as a court compelled arbitration of such disputes.

- 5 -

Enacted in 1925, the FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Thus, courts are required to place those agreements "on an equal footing with other contracts and enforce them according to their terms." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (internal citations omitted). The sweep of the Act extends to arbitration clauses in any contract that "evidenc[es] a transaction involving commerce," 9 U.S.C. § 2, which is to say that the Act extends to any contract that falls within Congress's extensive power to regulate activities "affecting" interstate commerce, Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 277 (1995) (holding that term "involving commerce" reflects "an intent to exercise Congress'[s] commerce power to the full").

Even so, employment contracts for certain classes of workers are exempt from the FAA. See Waithaka, 966 F.3d at 16. In this regard, the Act provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Supreme Court has interpreted the residual clause of this exemption to apply only to "transportation workers," meaning workers who play a "necessary role" in the interstate transport of goods. Sw. Airlines Co. v. Saxon, 142 S. Ct. 1783, 1789-90 (2022) (quoting Cir. City Stores,

- 6 -

Inc. v. Adams, 532 U.S. 105, 121 (2001)).  Whether workers are classified as employees or independent contractors, though, is of no consequence in construing the exemption:  the term "contracts of employment" applies "in a broad sense to capture any contract for the performance of work by workers."  New Prime Inc. v. Oliveira, 139 S. Ct. 532, 541 (2019) (emphasis omitted).

The appellants contend that they belong to a class of workers encompassed by the residual clause of section 1 and are therefore outside the grasp of the FAA.  Alternatively, they contend that if they do not fall within the section 1 exemption (because they are not workers "engaged in foreign or interstate commerce"), then their contracts with the appellee must perforce be outside the coverage of section 2.  We address each of these contentions in turn.[3]

**A**

To determine whether the appellants are exempt transportation workers under section 1, we first must define the relevant "class of workers" to which the appellants belong, and then ascertain "whether that class is 'engaged in foreign or

_____

[3] The appellants further contend that if the FAA does not apply, Massachusetts law renders the mandatory arbitration provision in their agreements unenforceable.  Because we conclude that the FAA does apply, see text infra, we need not address this contention.

interstate commerce.'"  Sw. Airlines, 142 S. Ct. at 1788 (quoting 9 U.S.C. § 1).

## 1

A "class of workers" is defined by the "actual work" that those workers typically do on the job, not necessarily by the industry in which they work.  Id.  Here, the appellants belong to a class of couriers who deliver both meals prepared at local restaurants and goods sold by local retailers.  Those deliveries are made in response to individual orders placed by local customers within the state; and in the course of each delivery, the couriers traverse, on average, only a few miles.

## 2

Having delineated the relevant class of workers, the issue reduces to whether that class is "engaged in foreign or interstate commerce."  9 U.S.C. § 1.  Unlike the words "involving commerce" in section 2, the phrase "engaged in . . . commerce" in section 1 does not invoke the full extent of Congress's commerce power but, rather, has "a more limited reach."  Cir. City, 532 U.S. at 115; see Wallace v. Grubhub Holdings, Inc., 970 F.3d 798, 800 (7th Cir. 2020) (describing scope of section 1's "engaged in commerce" language as "narrower" than scope of the phrase "involving commerce" found in section 2).  That limited reach extends only to workers who are "actively" engaged in moving "goods across borders via the channels of foreign or interstate commerce."

- 8 -

Sw. Airlines, 142 S. Ct. at 1790.  Put another way, the workers must play a "necessary role in the free flow of goods" across state or international borders.  Id. (quoting Cir. City, 532 U.S. at 121).  It follows, we think, that section 1 plainly applies to workers who in fact carry cargo across state borders.  See New Prime, 139 S. Ct. at 536, 539.  It also applies to those who load and unload cargo in the course of interstate shipments as that work is "so closely related to interstate transportation as to be practically a part of it."  Sw. Airlines, 142 S. Ct. at 1789 (quoting Balt. & Ohio Sw. R.R. v. Burtch, 263 U.S. 540, 544 (1924)).

### a

The extent of the exemption is not so clear, though, "when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders."  Id. at n.2.  Because this is such a case, we must carefully plot the contours of the phrase "engaged in foreign or interstate commerce."

At the outset of this inquiry, we are guided by our earlier decisions.  See Cunningham v. Lyft, Inc., 17 F.4th 244, 249-51 (1st Cir. 2021); Waithaka, 966 F.3d at 16-26.  And we hew to the path set forth by the Supreme Court by looking to the interpretation of similar terms in other statutory contexts, as

well as by examining the text of the statute itself.  See Cir. City, 532 U.S. at 114-19.

We start with Waithaka.  There, drivers for the ubiquitous online retailer Amazon posited that they were transportation workers enveloped by the section 1 exemption.  See Waithaka, 966 F.3d at 13.  They were not involved in the shipment of packages across state lines but, instead, were "last mile" drivers who delivered packages to Amazon customers — that is, they were responsible for the final leg of a package's interstate journey.  Id. at 13-14.  To determine whether those last-mile drivers fell within the section 1 exemption, we examined decisions interpreting the phrase "engaging in commerce between any of the several States" as used in the Federal Employers Liability Act, 45 U.S.C. § 51.  See id. at 19-22.  From those decisions we gleaned that workers who transport goods "entirely within a single state" may sometimes be workers "engaged in interstate commerce" as long as they actively contribute to the larger interstate movement of those goods.  Id. at 20; see Phila. & Reading Ry. Co. v. Hancock, 253 U.S. 284, 285-86 (1920); Seaboard Air Line Ry. v. Moore, 228 U.S. 433, 434-35 (1913).  Consequently, we held that the last-mile drivers were workers engaged in "the flow of interstate commerce." Waithaka, 966 F.3d at 22.  In so holding, we noted that at the time the FAA was enacted, "workers moving goods or people destined for, or coming from, other states" were sometimes considered to be

- 10 -

"engaged in interstate commerce," even if the workers were "responsible only for an intrastate leg of that interstate journey." Id.

Cunningham reflects the other side of the coin. There, we held that rideshare drivers transporting passengers to and from the principal airport serving the greater Boston area were not workers engaged in interstate commerce. See Cunningham, 17 F.4th at 253. In reaching that conclusion, we drew from the Supreme Court's decision in United States v. Yellow Cab Co., 332 U.S. 218 (1947), overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 759-61, 770-71, 777 (1984).

In Yellow Cab, the Court addressed the issue of whether taxi service from Chicago rail stations implicated "interstate commerce sufficient to bring the Sherman Antitrust Act into play."[4] Cunningham, 17 F.4th at 250. The Court considered two scenarios. The first involved taxi service arranged by the railroads for between-station transport. See Yellow Cab, 332 U.S. at 228. At the time, many interstate rail passengers were forced to disembark at one Chicago station (then a major railway hub) and transfer to

_____

[4] The Sherman Act forbids the restraint or monopolization of "trade or commerce among the several States." 15 U.S.C. §§ 1, 2. Although that law does not directly define the narrower "engaged in commerce" term we seek to exegete here, we found it logical to presume that activity not covered by the Sherman Act would necessarily be excluded from the scope of the narrower "engaged in interstate commerce" phraseology. See Cunningham, 17 F.4th at 251.

- 11 -

another to continue their interstate journeys.  See id.  The between-station service, then, was simply a local leg of a longer interstate trip, making it "clearly a part of the stream of interstate commerce."  Id.  As the Court explained:

> When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character.  That portion must be viewed in its relation to the entire journey rather than in isolation.  So viewed, it is an integral step in the interstate movement.

Id. at 228-29 (internal citations omitted).

The second scenario concerned local taxi service procured by individual customers at either the beginning or the end of their railway journeys.  See id. at 230.  The Court stressed that interstate commerce "is an intensely practical concept drawn from the normal and accepted course of business," id. at 231, and that although an individual's interstate journey may (in a sense) begin when one "leaves or enters his room or office and descends or ascends the building by elevator," id., those incidental aspects of the journey are not understood to be a "constituent part of the interstate movement," id. at 232.  The Court then held that the independent local taxi service was not an "integral part of interstate transportation" and, thus, was not covered by the Sherman Act.  Id. at 233.

- 12 -

In _Cunningham_, we followed the Court's lead and concluded that rideshare drivers who drive passengers to or from the airport are not engaged in interstate commerce because they provide local transport service akin to that exemplified in the second _Yellow Cab_ scenario. See _Cunningham_, 17 F.4th at 250-51. Such a result was compatible with _Waithaka_, we reasoned, because the last-mile delivery drivers in that case were responsible for a constituent part of the interstate delivery service that Amazon agreed to provide to its customers. See _id._ at 251. So viewed, the last-mile drivers were analogous to the taxi drivers in the first _Yellow Cab_ scenario as each driver's delivery was part of a longer interstate journey. See _id._[5]

It is also clear from other statutory contexts that the phrase "engaged in interstate commerce" is a term of art that does not encompass the local retail of goods, even if those goods previously have been shipped interstate. See, _e.g._, _United States v. Am. Bldg. Maint. Indus._, 422 U.S. 271, 285 (1975) (explaining that interstate shipment of cleaning supplies did not render janitorial services companies that purchased them from local

---

[5] The appellants suggest that _Yellow Cab_ and _Cunningham_ are inapposite because they concern the transport of people as opposed to goods. For present purposes, that distinction is irrelevant: we already have held that section 1 applies to transportation workers within the flow of interstate commerce regardless of whether they transport goods or people. _Waithaka_, 966 F.3d at 13, 26.

distributor "engaged in commerce" within meaning of Clayton Act, 15 U.S.C. § 18, because "flow of commerce had ceased" by time of purchase).  In other words, once an interstate shipment arrives at a local retailer and is "there held solely for local disposition and use," the goods are no longer considered to be "in interstate commerce."  A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 543 (1935) (construing term "in . . . interstate commerce" in National Industrial Recovery Act, ch. 90, § 3, 48 Stat. 195, 197 (1933)).

History, too, helps guide our inquiry.  When Congress enacted the FAA, the local retail of goods was not understood to be part of interstate commerce.[6]  See Indus. Ass'n of S.F. v. United States, 268 U.S. 64, 79 (1925).  The delivery of interstate goods was the "closing incident of the interstate movement" and subsequent transactions were then the "result of new and

---

[6] We are mindful that the Supreme Court has rejected a method of interpreting the phrase "engaged in commerce" that considers "the scope of the Commerce Clause, as then elaborated by the Court, at the date of the FAA's enactment in order to interpret what the statute means now." Cir. City, 532 U.S. at 116.  Yet, we also have been directed to interpret the statutory text according to the meaning of its words as they were understood at the time Congress enacted the statute.  See Sw. Airlines, 142 S. Ct. at 1788-90; New Prime, 139 S. Ct. at 539.  For present purposes, it suffices to say that we look to cases contemporaneous with the enactment of the FAA to confirm our understanding of "engaged in foreign or interstate commerce" as a term of art and to provide useful context as to the statute's meaning when it was enacted. We do not endeavor to "deconstruct" section 1 based on the state of Commerce Clause jurisprudence in 1925.  Cir. City, 532 U.S. at 118.

independent arrangements."  Id.; see Missouri ex rel. Barrett v. Kan. Nat. Gas Co., 265 U.S. 298, 308 (1924) ("With the delivery of the gas to the distributing companies, however, the interstate movement ends.  Its subsequent sale and delivery by these companies to their customers at retail is intrastate business and subject to state regulation."); Weigle v. Curtice Bros. Co., 248 U.S. 285, 288 (1919) (holding that state regulation concerning local retail of interstate food products did not affect "the action of Congress in interstate commerce" because challenged regulation was "the exercise of an authority outside of that commerce").

Nor does the term "engaged in interstate commerce" extend to the intrastate sale of locally manufactured goods.  See Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 198-99 (1974) (holding that sale of asphalt produced in-state was not a sale "in commerce" within the meaning of the Clayton and Robinson-Patman Acts, 15 U.S.C. §§ 13(a), 14, 18).  That is the case even if the intrastate sale might, in a broader sense, affect interstate commerce.  See FTC v. Bunte Bros. 312 U.S. 349, 351 (1941) (rejecting contention that Federal Trade Commission Act's proscription against unfair trade practices "in commerce," 15 U.S.C. § 45(a), included practices of intrastate candy manufacturer and retailer that were potential "handicap to interstate competitors").

Refining the matter to bare essence, we proceed upon the following principles. The term "engaged in foreign or interstate commerce" in section 1 can apply to workers who are engaged in the interstate movement of goods, even if they are responsible for only an intrastate leg of that movement. See Waithaka, 966 F.3d at 26. Their work, though, must be a constituent part of that movement, as opposed to a part of an independent and contingent intrastate transaction. See Cunningham, 17 F.4th at 251; see also Yellow Cab, 332 U.S. at 231. And the interstate movement necessarily terminates when those goods arrive at the local manufacturer or retailer (as local manufacturing and retailing have not been understood to be "in" interstate commerce). See, e.g., Bunte Bros., 312 U.S. at 351; A.L.A. Schechter Poultry Corp., 295 U.S. at 543.

This interpretation is consistent with the Court's construction of section 1's residual clause in Circuit City. Invoking the ejusdem generis canon of statutory construction, the Court instructed that "the residual clause should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it." Cir. City, 532 U.S. at 115; see Wallace, 970 F.3d at 800-01 (explaining that "presence of specific exemptions for 'seamen' and 'railroad [employees]'" helps define "the scope of the residual clause,"

- 16 -

which is "narrower" than the coverage provision of section 2); see also Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 10-11 (1st Cir. 2022) (applying ejusdem generis canon). It follows that the workers included in section 1's residual clause should be necessary to the interstate transport of goods in the same way as seamen and railway workers. Excluding those who locally transport goods — not as part of an interstate movement but, instead, as a contingent consequence of it — is in keeping with a faithful reading of the statute.

From what we have said, it is conspicuously clear that the appellants do not belong to a class of workers "engaged in foreign or interstate commerce." 9 U.S.C. § 1. Although the appellants transport goods, qua couriers, they do so as part of separate intrastate transactions that are not themselves within interstate commerce. That the delivered items may have once travelled across state borders does not alter the equation. The interstate journey terminates when the goods arrive at the local restaurants and retailers to which they are shipped. Customers then purchase those meals and goods from local businesses. Thus, when the couriers set out to deliver customer orders, they do so as part of entirely new and separate transactions. And the record is luminously clear that those new and separate transactions are intrastate in nature as almost all deliveries made by the couriers as a class are completed within the state in which the order is

placed. In a nutshell, couriers making deliveries from local businesses are transporting goods as part of local intrastate commerce.

**b**

The appellants resist this conclusion, arguing that our decision in Waithaka demands a different result. They argue that the couriers deliver goods that remain in interstate commerce until those goods are received by retail consumers. The couriers therefore are responsible — their thesis runs — for an intrastate leg of what is a longer interstate shipment such that the couriers, like the last-mile drivers in Waithaka, are within a class of workers exempted from the FAA. According to the appellants' thesis, the arrival of the goods at local restaurants and convenience stores does not mark an end to the interstate journey; rather, that delivery is no more than a momentary halt in the flow of commerce — much like the temporary storage of Amazon products in warehouses before drivers deliver them to customers.

We reject the appellants' thesis because it ignores the fundamental difference in the relevant transactions. In Waithaka, customers bought goods directly from Amazon, which orchestrated the interstate movement of those goods and arranged, as part of the purchase, for their delivery directly to the customer. That local delivery was therefore integral to the interstate movement

such that the goods remained within the flow of interstate commerce until arriving at the customer's doorstep.

The case at hand is a horse of a distinctly different hue. Nothing in the record suggests (nor have the appellants argued) that customers summoning couriers for local deliveries are buying goods as part of an interstate transaction. To the contrary, the goods are purchased from local vendors — and at that point, the goods have already exited the flow of interstate commerce. See Am. Bldg. Maint. Indus., 422 U.S. at 285. Here, it is nose-on-the-face plain that the interstate movement terminated when the goods arrived at local restaurants and grocery stores. It makes little sense, then, to suggest that when those goods are again transported contingent to an intrastate purchase — the raw ingredients now commingled with others and prepared into a meal; the packaged good proceeding singly, bereft of its interstate brethren — they somehow resurface into the flow of interstate commerce.

Let us be perfectly clear. To be "engaged in interstate commerce" is a "practical concept" that excludes intrastate transactions that bear only a "casual" or "incidental" relationship to the interstate movement of goods or people. Yellow Cab, 332 U.S. at 231. Purchases from local restaurants and businesses are emblematic of such intrastate transactions. The deliveries that are thereafter made in fulfillment of those

- 19 -

purchases bear only a tenuous relationship to the interstate movement of goods and therefore cannot bring the couriers within the protective carapace of the Act's section 1 exemption.

The appellants press a related argument. They insist that courier deliveries are not incidental to interstate shipments but rather are so integral to them that the couriers are akin to workers who load and unload cargo during its interstate transport. See Balt. & Ohio Sw. R.R., 263 U.S. at 544. That analogy is fatally flawed: although those who load interstate cargo are "part of the interstate transportation of goods," Sw. Airlines, 142 S. Ct. at 1789, the same cannot be said of the couriers (who play no role in the interstate movement of goods). It is by happenstance, and not a result of any contribution of theirs to the interstate journey, that the goods they carry have crossed a state border at some point in time. In other words, the interstate journeys of the goods that the couriers carry have already been completed by the time the couriers enter the picture, and, thus, the couriers' trips are distinct intrastate journeys.

The appellants also argue that the fact that the goods come to rest at local restaurants and convenience stores is of no account because multiple entities may be responsible for different portions of an item's interstate transport without interrupting the flow of the interstate movement. There may be a kernel of truth in the appellants' suggestion: we do not hold here that the

interstate movement must consist of a single transaction. It may be possible that goods can change hands several times during transport without exiting the flow of interstate commerce. See Stafford v. Wallace, 258 U.S. 495, 515-16 (1922) (holding that selling and buying of livestock at stockyard were transactions in interstate commerce because "[s]uch transactions can not be separated from the [interstate] movement to which they contribute and necessarily take on its character"). And we made clear in Waithaka that our holding did not depend upon a class of workers being employed by a company of any particular size or geographic scope. See Waithaka, 966 F.3d at 23.

All of that is true as far as it goes — but it does not take the appellants very far. The appellants conflate the necessary intrastate logistics or transactions that are integral to the interstate transport of goods (and that are, therefore, "in" interstate commerce) with purely local economic activity that may depend on interstate commerce but is — "[f]rom the standpoints of time and continuity" — nonetheless "distinct" and "separate." Yellow Cab, 332 U.S. at 232.

That is not to say that local economic activity cannot, under any circumstance, be integral to the interstate movement of goods or people. The "flow of interstate commerce" is a concept that looks to the "economic continuity in the generation of goods and services for interstate markets and their transport and

distribution to the customer." Gulf Oil, 419 U.S. at 195.  But it is precisely that "economic continuity" that is lacking here:  the appellants do not identify any record evidence that suggests that customers used the appellee's platform to arrange for the interstate delivery of their ordered goods (as was the case in Waithaka).  Nor do the appellants contest the fact that couriers routinely deliver goods as part of local purchases from local restaurants and retailers.

Rather, the appellants' asseverational array rests on the notion that because couriers deliver goods that previously had moved across state borders, they are therefore transportation workers engaged in interstate commerce.  That argument fails because the fact that the goods have moved across state borders is not alone sufficient to bring the workers within the purview of section 1.  Instead, the workers must be actively engaged in the interstate transport.  See Sw. Airlines, 142 S. Ct. at 1790.

In Waithaka, the last-mile drivers played an active role in completing interstate package deliveries.  In this case, by contrast, the couriers deliver goods that have already exited the flow of interstate commerce.  They are therefore not exempt from the FAA by reason of section 1.

Arriving at this conclusion in no way requires us to blaze a new trail.  Courts that have addressed this issue under the same circumstances have reached the same conclusion.  See,

e.g., Wallace, 970 F.3d at 803; Archer v. Grubhub Inc., 190 N.E.3d 1024, 1031-33 (Mass. 2022). The appellants contend that Walling v. Jacksonville Paper Co., 317 U.S. 564 (1943), is to the contrary. We do not agree.

In Walling, the Supreme Court held that a paper wholesaler that made intrastate deliveries was "in commerce" as understood by the Fair Labor Standards Act, 29 U.S.C. §§ 206(a), 207(a). Id. at 568-69. The Court stated that so long as there was a "practical continuity of movement" of goods from the out-of-state paper manufacturers, through the wholesaler's warehouse, and afterwards on to the customer, the interstate journey was not "ended by reason of a temporary holding of the goods at the warehouse." Id. at 569.

Our conclusion here — and the holdings in Wallace and Archer — are not to the contrary. The couriers in this case do not make deliveries on behalf of wholesalers or distributors that transport goods to local retail establishments. Instead, they make deliveries to fulfill local retail sales.[7] Walling makes

---

[7] For the same reason, this case is distinguishable from Nieto v. Fresno Beverage Co., in which the court held that drivers making intrastate deliveries for a beverage distributor (that had admitted that the beverage shipments were "part of a continuous stream of interstate travel") were workers exempt from the FAA under section 1. 245 Cal. Rptr. 3d 69, 71, 76 (Cal. Ct. App. 2019). Nothing in that decision suggests that deliveries in fulfillment of local retail transactions should be considered to come within the flow of interstate commerce.

clear that such sales should not be considered "in commerce." Id. at 571.

The short of it is that couriers who deliver meals and goods as the result of local purchases from local vendors are not within a class of workers "engaged in foreign or interstate commerce" who are exempt from the FAA under section 1. The FAA therefore applies to their agreements with the appellee unless those agreements fall outside the coverage of section 2. It is to that question that we now turn.

**B**

As a fallback, the appellants argue that if they are not deemed to be workers "engaged in" interstate commerce for the purpose of section 1, the FAA cannot apply to them at all because their work would then fall outside the coverage provision of section 2, which extends the FAA's reach to all contracts "involving" interstate commerce. 9 U.S.C. §§ 1, 2. They reason that if they are not workers "engaged in" interstate commerce, then their contracts cannot conceivably "involv[e]" commerce under the Act. Id.

That argument cannot withstand scrutiny. The terms "engaged in commerce" and "involving commerce" are not coextensive. Cir. City, 532 U.S. at 115. In particular, the term "involving commerce" has been construed to extend the FAA's reach to the limits of Congress's commerce power. Allied-Bruce Terminix

- 24 -

Cos., 513 U.S. at 277. Thus, it is entirely possible that an employment contract for a worker who is not "engaged in interstate commerce" within the purview of section 1 may nonetheless be a contract "involving commerce" within the purview of section 2. See Wallace, 970 F.3d at 803.

The appellants argue that the Supreme Court's statement in New Prime that "[section] 1 helps define [section] 2's terms," 139 S. Ct. at 537, altered the Court's prior decisions in Allied-Bruce and Circuit City, recasting the respective scopes of the exemption and coverage provisions such that they are now coextensive with one another. That argument misreads New Prime. There, the Court simply stated that a court's power to stay litigation and compel arbitration under sections 3 and 4 of the FAA are limited to cases that arise from contracts covered by section 2. Id. But section 2's scope does not capture contracts that are exempt under section 1. See id. The section 1 exemption, therefore, "helps define [section] 2's terms." Id. Because a court's power to compel arbitration depends on whether a contract is excluded by section 1 or encompassed by section 2, a court must consider those provisions in relation to each other when determining if it has the power to compel arbitration. See id. Thus, the New Prime Court's instruction to consider the two provisions of the FAA in relation to each other in no way calls

into question the Court's earlier decisions in Allied-Bruce and Circuit City.

We add, moreover, that the Court reconsiders its prior decisions with the "utmost caution," State Oil Co. v. Khan, 522 U.S. 3, 20 (1997), and the overturning of its own precedent is "never a small matter," Kimble v. Marvel Ent., LLC, 576 U.S. 446, 455 (2015). It would therefore be unreasonable to assume that the Court reversed course in New Prime as dramatically as the appellants contend it did without any comment or discussion. It is apparent to us that Allied-Bruce and Circuit City reflect the law as it currently stands, and we are duty bound to apply that law here.

That ends this aspect of the matter. The contracts the appellants signed with the appellee are subject to the FAA as long as they fall within the limits of Congress's power to regulate activities "affecting" interstate commerce. Allied-Bruce Terminix Cos., 513 U.S. at 274. And it is difficult to fathom how they could not here: the contracts at issue concerned the delivery of goods in local retail, a commercial activity that — although distinct from the interstate shipment of goods — has a substantial effect on interstate commerce. See United States v. Lopez, 514 U.S. 549, 565-66 (1995) ("We do not doubt that Congress has authority under the Commerce Clause to regulate numerous

commercial activities that substantially affect interstate commerce . . . .").

The appellants do not argue to the contrary, except to repeat the refrain that, "[a]s a logical matter," if they are not workers "engaged in commerce," then their contracts cannot be "involved" in commerce.[8] But that argument only holds if "engaged in" and "involving" mean the same thing — and in this context, they do not. See Cir. City, 532 U.S. at 115, 121; see also Wallace, 970 F.3d at 803.

In sum, the appellants' employment contracts are covered under section 2 of the Act because couriers who make local retail deliveries affect interstate commerce, but those contracts are not exempt under section 1 because the appellants are not part of a class of workers actively engaged in the interstate transport of goods. The district court was therefore required to compel arbitration according to the terms agreed to by the parties.

---

[8] The sole authority that the appellants cite in support of this argument concerned postal workers engaged in the interstate shipment of packages, who neither party to that case contested were workers "engaged in commerce." Am. Postal Workers Union v. U.S. Postal Serv., 823 F.2d 466, 473 (11th Cir. 1987). That case is factually distinguishable from the case at hand as the couriers — unlike postal workers — are simply not engaged in the interstate shipment or delivery of packages.

### III

We need go no further.  For the reasons elucidated above, the judgment of the district court is


**Affirmed**.