PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-3234
_____

JASWINDER SINGH, on behalf of himself and
all those similarly situated,
                                        Appellant

v.

UBER TECHNOLOGIES, INC.

_____

No. 21-3363
_____

JAMES CALABRESE; GREGORY CABANILLAS;
MATTHEW MECHANIC,
individually and on behalf of all others similarly situated,
                                        Appellants

v.

UBER TECHNOLOGIES, INC.; RAISER, LLC

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action Nos. 3-16-cv-03044 and 3-19-cv-18371)
District Judge: Honorable Freda L. Wolfson

_____

ARGUED: November 8, 2022

Before: JORDAN, SCIRICA, and RENDELL,
*Circuit Judges*.

(Filed: April 26, 2023)


Matthew D. Miller
Justin L. Swidler [ARGUED]
Swartz Swidler
9 Tanner Street
Suite 101
Haddonfield, NJ 08033

   *Counsel for Appellant in No. 21-3234*

Catherine E. Anderson
Giskan Solotaroff & Anderson
90 Broad Street
2nd Floor
New York, NY 10004

Roosevelt N. Nesmith [ARGUED]
363 Bloomfield Avenue
Suite 2-C

Montclair, NJ 07042

Russell S. Warren, Jr.
473 Sylvan Avenue
Englewood Cliffs, NJ 07632

   *Counsel for Appellants in No. 21-3363*

Samuel E. Eckman
Theane D. Evangelis [ARGUED]
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071

Blaine H. Evanson
Gibson Dunn & Crutcher
3161 Michelson Drive
Suite 1200
Irvine, CA 92612

Paul C. Lantis
Littler Mendelson
1601 Cherry Street
Three Parkway, Suite 1400
Philadelphia, PA 19102

   *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

**SCIRICA**, *Circuit Judge*.

The Federal Arbitration Act (FAA) compels federal courts to enforce a wide range of arbitration agreements. But it does not apply to arbitration agreements contained in the "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. These consolidated appeals ask us to decide whether Uber drivers belong to such a class of workers. We conclude, as have our sister circuits, that they do not. The work of Uber drivers is centered on local transportation. Most Uber drivers have never made a single interstate trip. When Uber drivers do cross state lines, they do so only incidentally, as part of Uber's fundamentally local transportation business. As a result, they are not "engaged in foreign or interstate commerce" for the purposes of § 1 of the FAA. The District Court reached this conclusion in a detailed and carefully reasoned opinion. We will affirm.

## I.

The FAA, enacted "in response to a perception that courts were unduly hostile to arbitration," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018), requires courts to "'rigorously enforce' arbitration agreements according to their terms," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (citation omitted). But the FAA's scope is not limitless. Expressly exempted from its coverage are arbitration agreements within the "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1; *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001). Our decision

addresses the scope of that final phrase—"any other class of workers engaged in foreign or interstate commerce"—otherwise known as the "residual clause."

Two principles guide our analysis. First, the FAA's statutory context and purpose compel us to give § 1 "a narrow construction." *Circuit City*, 532 U.S. at 118. Second, the scope of the residual clause is "controlled and defined by reference to the enumerated categories" of seamen and railroad workers designated in the statute. *Id.* at 115.

A.

This consolidated appeal arises out of two cases filed against Uber by its drivers—*Singh v. Uber Technologies* and *Calabrese v. Uber Technologies*. In each case, Uber successfully moved to compel arbitration under the terms of its agreements with the drivers. We described the facts of Singh's case in our previous decision, *Singh v. Uber Technologies, Inc.*, 939 F.3d 210 (3d Cir. 2019), and briefly review them here.

Plaintiffs are current or former Uber drivers from many different states—New Jersey, New York, Ohio, Pennsylvania, Missouri, and Nevada. At one time or another, each agreed to a contract Uber calls its "Technology Services Agreement" as a condition of using Uber's platform. The content of the relevant provisions of the agreement is not in dispute.

The agreement requires drivers to "resolve disputes with [Uber] on an individual basis through final and binding arbitration unless [the driver] choose[s] to opt out." JA3, 168 (emphasis omitted). This includes "every claim or dispute that lawfully can be arbitrated," save a few specific exceptions.

5

JA153. Under the agreement, an arbitrator—not "a court or judge"—is to decide any dispute "relating to interpretation or application" of the provision, including its "enforceability, revocability or validity." JA4, JA82. Drivers who do not wish to be bound by the arbitration provisions may opt out by sending Uber an email or letter to that effect.

Singh's case began six years ago as a putative class action in New Jersey state court. *Singh*, 939 F.3d at 215. Singh alleged Uber had violated New Jersey wage and hour laws by misclassifying drivers as independent contractors, had failed to pay them the minimum wage, and had failed to reimburse them for business expenses. Uber removed the action and then successfully moved to dismiss the case and compel arbitration pursuant to the terms of its arbitration agreement with Singh. *Id.* at 216. The District Court held that § 1 applied only to transportation workers who move goods, not those who carry passengers. *Id.* at 216-17. Singh appealed to this Court and we reversed, holding that the exception applies equally to "transportation workers who transport passengers, so long as they are engaged in interstate commerce or in work so closely related thereto as to be in practical effect part of it." *Id.* at 214. We reaffirmed our longstanding view of the residual clause as including those classes of workers "actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it." *Id.* at 220 (quoting *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., (U.E.) Local 437*, 207 F.2d 450, 452 (3d Cir. 1953) (en banc)).

We remanded to the District Court to determine whether Singh belonged to a class of transportation workers "engaged in interstate commerce." *Id.* at 226-27. Because this question

6

could not be answered from the complaint alone, we directed that "discovery must be allowed before entertaining further briefing on the question." *Id.* at 226. We encouraged the District Court to consider "various factors," including but not limited to "the contents of the parties' agreement(s), information regarding the industry in which the class of workers is engaged, information regarding the work performed by those workers, and various texts—*i.e.*, other laws, dictionaries, and documents—that discuss the parties and the work." *Id.* at 227-28.

Calabrese filed his case in the District of New Jersey in September 2019, just a few weeks after our decision in *Singh*. The District Court consolidated the case with Singh's and ordered joint discovery. Like Singh, Calabrese claimed that Uber had violated various labor and employment laws. He also sought to proceed collectively under the Fair Labor Standards Act.[1]

The District Court ordered that joint discovery before again ruling in Uber's favor and compelling arbitration. The court defined the relevant class as Uber drivers nationwide. Based on the record developed in discovery and the factors listed above, the court determined that neither the arbitration agreement nor the total number of cross-border trips was

[1] Several additional plaintiffs opted in to Calabrese's case. The suit originally included himself (James Calabrese), Gregory Cabanillas, and Matthew Mechanic as plaintiffs. Several more plaintiffs opted-in later: Bulent Tasdemir, Salvador Delgado, Vernon Small, Shane Golden, Shyidah Johnson, Corey Wims, Denis Odom, Robin Rienerth, and Scott Tucker. We refer to all these plaintiffs collectively as "Calabrese."

dispositive. More significant, the court found, was "evidence that [interstate] rides constitute just 2% of all rides, resemble in character the other 98% of rides, and likely occur due to the happenstance of geography." JA32.

The District Court compelled arbitration in a thorough and well-reasoned opinion.

## B.

Two other appeals courts have concluded that rideshare drivers[2] do not constitute a "class of workers engaged in foreign or interstate commerce" under § 1. In *Capriole v. Uber Technologies, Inc.*, 7 F.4th 854, 865 (9th Cir. 2021), the Ninth Circuit found that "interstate movement" was not a "central part of [Uber drivers'] job description." The court noted that Uber drivers primarily made "short and local" trips and crossed state lines "infrequently." *Id.* Even these infrequent trips across state lines were still "inherently local in nature"—any interstate component was a mere "happenstance of geography" which did not alter Uber drivers' fundamentally "*intra*state transportation function." *Id.* at 864 (emphasis added) (citations omitted).

The First Circuit charted a similar course in *Cunningham v. Lyft, Inc.*, 17 F.4th 244 (1st Cir. 2022). The court pointed out that "not all Lyft drivers engage in any

---

[2] By "rideshare drivers," we mean those who use "a mobile app or website" in order "to collect and transport a fare-paying customer to a chosen destination." *Ride-Share*, Oxford English Dictionary (3d ed. updated Mar. 2022), https://www.oed.com/view/Entry/165647#eid179399275.

8

interstate transportation." *Id.* at 252. The court recognized that the residual clause must be given a "narrow construction," and that its meaning was controlled by the enumerated categories of "seamen" and "railroad workers," who were "primarily devoted to the movement of goods and people beyond state boundaries." *Id.* at 253. Lyft drivers, the court found, were not. *Id.* Lyft as a company was "primarily in the business of facilitating local, intrastate trips." *Id.* The court concluded for these reasons that "Lyft drivers are not among a class of transportation workers engaged in interstate commerce within the meaning of section 1 as narrowly construed." *Id.*

II.[3]

To decide whether Plaintiffs are members of a "class of workers engaged in foreign or interstate commerce," a court must first define the "class of workers" at issue. We agree with the District Court that the class should be defined as nationwide Uber drivers.[4] *See Capriole*, 7 F.4th at 862.

_____

[3] The District Court had jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1367, 1453, and 29 U.S.C. § 216. We have appellate jurisdiction over the final judgment of the District Court compelling arbitration under 28 U.S.C. § 1291. We review the court's order compelling arbitration de novo. *Singh*, 939 F.3d at 217. As "the party resisting arbitration," Plaintiffs bear the burden of showing "that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000).

[4] Companies other than Uber employ rideshare drivers. The parties' arguments in this case have understandably focused on Uber, and they have not discussed the practices of other companies offering similar services. The District Court defined

9

We begin, as the Supreme Court has instructed, by examining the types of workers specifically mentioned in the FAA's text—"seamen" and "railroad employees." *See Circuit City*, 532 U.S. at 115. "As those terms contain 'no geographic limitations,' 'the most natural inference is that Congress intended those terms to encompass *all* seamen and railroad employees nationwide.'" *Capriole*, 7 F.4th at 862 (quoting *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 15 (D.D.C. 2021) (Brown Jackson, J.)). We give the residual clause the same national scope. The parties do not dispute this approach. Accordingly, the relevant "class of workers" must cover the whole country.

In addition, the class of workers must include all Uber drivers.[5] In interpreting the FAA, the Supreme Court has repeatedly emphasized the Act's use of the term "workers." *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) (quoting *New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 540-41 (2019)). This word "directs the interpreter's attention to 'the *performance* of work,'" and, when coupled with the word "engaged," "emphasizes the actual work that the members of

---

the class as "Uber drivers nationwide," JA12, but elsewhere in its opinion referred more generally to "rideshare drivers nationwide," JA15. The parties' arguments—and our decision—encompass those who do substantially similar work for different companies. The precise framing of the class as either Uber drivers or rideshare drivers makes no difference to our opinion. *See Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 16 n.8 (D.D.C. 2021) (Brown Jackson, J.) (following the same practice for Lyft drivers).

[5] The *Calabrese* Plaintiffs, for their part, do not appear to contest either part of this definition.

10

the class, as a whole, typically carry out." *Id.* This work must be defined specifically. *See Circuit City*, 532 U.S. at 118 (emphasizing that the § 1 exception must be given "a narrow construction").[6]

---

[6] Singh argues that we would be wrong to construe the § 1 exception narrowly, as the "Supreme Court has since abandoned the rule that statutory exemptions should be narrowly construed." Singh Br. 20. But *Circuit City* did not depend on a general principle that all statutory exemptions should be narrowly construed. Rather, the Court determined that § 1 should be narrowly construed because of the FAA's "statutory context" and "purpose." 532 U.S. at 118. More specifically, the statute's designation of "specific categories of workers" before the residual clause "undermines any attempt to give [the residual clause] a sweeping, open-ended construction." *Id.* The Court also relied on the FAA's purpose, which "seeks broadly to overcome judicial hostility to arbitration agreements." *Id.* (quoting *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 272-73 (1995)). These FAA-specific considerations, and not any general principle, drove the result in *Circuit City*. Singh's cases, which attack only the latter, are therefore inapplicable. *See BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1538-39 (2021) (rejecting a general principle of narrow construction for statutory exceptions). Regardless, we would be obligated to follow the specific holding of the Court in *Circuit City* even if its justifications were undermined by "some other line of decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Fairly construed, the § 1 exception has a narrow scope.

11

Accordingly, we reject Singh's proposed class of "motor carrier workers" as too broad to be sustained. The Supreme Court recently rejected a similar class of airline employees. *Saxon*, 142 S. Ct. at 1788-89. Like "airline employees," "motor carrier workers" is too general a description to explain much about class members' actual work. *See Saxon*, 142 S. Ct. at 1788.[7]

After defining the proper scope of the class at issue, we next consider what it means for a class of workers to be "engaged in interstate commerce" for purposes of § 1. Plaintiffs argue that rare engagement is enough. We instead conclude, in line with our sister circuits, that a class of workers comes within the exception only if "interstate movement of goods" or passengers is "a central part" of the job description of the class. *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020) (Barrett, J.); *accord Capriole*, 7 F.4th at 864 (adopting the same standard); *Cunningham*, 17 F.4th at 253 (similar); *see also Saxon*, 142 S. Ct. at 1789-90 (explaining that the residual clause only applies to "transportation workers"—those who are "actively engaged in transportation" of goods or people "via the channels of foreign or interstate commerce"). Put another way, the class must either be "actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it." *Singh*, 939 F.3d at 220 (quoting *Tenney*, 207 F.2d at 452).

---

[7] On remand, the District Court collected decisions from district courts that likewise defined the class as Uber (or Lyft) drivers nationwide.

We have suggested a non-exhaustive list of factors to structure the residual clause inquiry: "the contents of the parties' agreement(s), information regarding the industry in which the class of workers is engaged, information regarding the work performed by those workers, and various texts—*i.e.*, other laws, dictionaries, and documents—that discuss the parties and the work." *Id.* at 227-28. As the District Court recognized, these factors are useful guides but do not change the core question of whether interstate commerce is central to the class's job description.

Our focus on the centrality of interstate work is compelled by the principle that the scope of the residual clause is "controlled and defined by reference to the enumerated categories" of seamen and railroad workers. *Circuit City*, 532 U.S. at 115. Seamen and railroad workers are "primarily devoted to the movement of goods and people beyond state boundaries." *Cunningham*, 17 F.4th at 253. Their jobs are "centered on the transport of goods in interstate or foreign commerce." *Wallace*, 970 F.3d at 802. The residual clause must be similarly limited.

The FAA's text and structure lead to the same result. Compare the language of the FAA's operative provision, contained in § 2, with the language of the § 1 exception at issue here. Section 2 applies to any "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. This broad language "reach[es] to the limits of Congress' Commerce Clause power." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (1995). By contrast, § 1 uses the narrower formulation "engaged in interstate commerce." *See Circuit City*, 532 U.S. at 118. This formulation limits the clause's scope to workers employed "in the channels" of interstate

13

commerce. *Great W. Mortg. Corp. v. Peacock*, 110 F.3d 222, 227 (3d Cir. 1997); *Wallace*, 970 F.3d at 802. Accordingly, the clause only applies to those whose jobs are centered on "interstate transportation routes through which persons and goods move." *United States v. Morrison*, 529 U.S. 598, 613 n.5 (2000) (citation omitted).

Workers "who are actually engaged in the movement of interstate or foreign commerce"—for example, interstate truckers—easily qualify under the residual clause. *Singh*, 939 F.3d at 220 (quoting *Tenney*, 207 F.2d at 452); *New Prime*, 139 S. Ct. at 536, 539 (observing that interstate truck drivers are plainly a class of workers engaged in interstate commerce). But the exception is not limited to such workers.

A class of workers that does not regularly cross state lines will qualify if their work is "so closely related" to interstate commerce "as to be in practical effect part of it." *Singh*, 939 F.3d at 220 (quoting *Tenney*, 207 F.2d at 452). Work meets this standard if it is a "constituent part" of the interstate movement of goods or people rather than a "part of an independent and contingent intrastate transaction." *Immediato v. Postmates, Inc.*, 54 F.4th 67, 77 (1st Cir. 2022) (citing *Cunningham*, 17 F.4th at 251).

It is not always easy to tell whether work is a "constituent part" of the flow of interstate commerce or occurs outside of it. *See Immediato*, 54 F.4th at 79 (observing that "[i]t may be possible that goods can change hands several times during transport without exiting the flow of interstate commerce" and that a class of workers need not be "employed by a company of any particular size or geographic scope"). Our analysis focuses on "practical, economic continuity." *Osvatics*,

14

535 F. Supp. 3d at 18-19 (quotation marks omitted) (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974)).

Some recent decisions help clarify the line between classes of workers who qualify under the residual clause and classes of workers that do not. On one side of the line are those whose work occurs within the flow of interstate commerce. In *Saxon*, for example, the Supreme Court held a class of Southwest Airlines baggage handlers fell under § 1. As loaders of interstate cargo, these baggage handlers performed work which was part of an unbroken stream of interstate commerce. *Saxon*, 142 S. Ct. at 1790. Similarly, in *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 13 (1st Cir. 2020), the First Circuit held that Amazon delivery drivers who "locally transport[ed] goods on the last legs of interstate journeys," fell under § 1 because their work occurred "within the flow of interstate commerce." On the other side of the line are workers who engage in primarily local economic activity with only tangential interstate connections. Food delivery drivers, for example, can be distinguished from Amazon delivery drivers, as the former deliver food only after it has left the stream of interstate commerce. *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 916 (9th Cir. 2020); *Wallace*, 970 F.3d at 802-03. Similarly, Chicago taxi drivers provide "independent local service" which is "not an integral part of interstate transportation." *United States v. Yellow Cab Co.*, 332 U.S. 218, 233 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

Plaintiffs argue along various lines to reach the conclusion that even a trivial amount of interstate transportation work suffices to bring a worker within the exception. This conclusion must be rejected. It is contrary to

the principles described above and would contravene the basic policy of the FAA, which is to broadly place arbitration agreements on equal footing with other contracts. *See Circuit City*, 532 U.S. at 115, 118-19. Plaintiffs' interpretation would cover even "a pizza delivery person who delivered pizza across state lines to a customer in a neighboring town." *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005). There is no evidence to suggest that Congress meant to cover such workers. *See Wallace*, 970 F.3d at 802-03; *Immediato*, 54 F.4th at 77-78; *Archer v. Grubhub, Inc.*, 190 N.E.3d 1024, 1031-33 (Mass. 2022). Congress' use of the enumerated categories of "seamen" and "railroad employees," when coupled with the narrow construction due the exception, convinces us that the residual clause includes only those workers whose jobs are centered on interstate commerce.

We are unpersuaded by Singh's argument that there is no way to know that the key shared characteristic of "seamen" and "railroad employees" is having a job centered on interstate commerce. Congress meant to identify engagement in interstate commerce as the enumerated categories' key shared characteristic. The FAA's text makes it explicit—the residual clause requires that a class of workers is "engaged in interstate commerce." *See* 9 U.S.C. § 1. This text is "[t]he best evidence of Congress' intent." *United States v. Schneider*, 14 F.3d 876, 879 (3d Cir. 1994).

This approach is consistent with *Saxon*. Singh emphasizes a single sentence—the Court's statement that "any class of workers directly involved in transporting goods across state or international borders falls within § 1's exemption." *Saxon*, 142 S. Ct. at 1789. As the rest of the opinion makes clear, this does not mean that rare border crossings are enough

to make interstate transportation central to a class of workers' job description. Rather, we consider the "actual work" that class members "typically carry out." *Id.* at 1788. Incidental border crossings are insufficient if a class of workers is not typically involved with the channels of interstate commerce. *Wallace*, 970 F.3d at 800 ("[S]omeone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work."); *Waithaka*, 966 F.3d at 25 (noting that crossing state lines is not the "touchstone of the exemption's test").[8]

## III.

We now turn to the key question: Is engagement with interstate commerce central to the work of Uber drivers? The District Court found that it was not. We agree. As a class, Uber drivers are in the business of providing local rides that sometimes—as a happenstance of geography—cross state borders. Remove interstate commerce from the equation, and

---

[8] Both Singh and Calabrese urge us to follow *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 956 (7th Cir. 2012), which they read to hold that crossing a state line even once means that a worker is engaged in interstate commerce for purposes of § 1. As explained above, this position is at odds with *Saxon,* our precedents, and the majority approach of our sister courts. The duties of seamen and railroad employees are defined by interstate commerce—remove interstate commerce from the equation, and the fundamental character of their work changes. So too must the work of any class of workers covered by § 1. *See, e.g.*, *Waithaka*, 966 F.3d at 22-24.

17

the work of Uber drivers remains fundamentally the same. Plaintiffs have not shown that drivers' infrequent interstate trips are, on the whole, an essential part of their job. Indeed, their statistics demonstrate that most Uber drivers have never made a single interstate trip. Neither have Plaintiffs shown that drivers' intrastate duties, such as driving riders to and from airports, are a "constituent part" of the interstate movement of goods or people. *Immediato*, 54 F.4th at 77. As a result, we conclude that Uber drivers are not a class of workers engaged in interstate commerce and, accordingly, that they do not fall under the § 1 exception.

The other appeals courts to consider this question have reached the same conclusion. Plaintiffs, however, encourage us to disregard these decisions on the grounds that those courts had insubstantial evidentiary records before them. *See Singh*, 939 F.3d at 226-27. Without the benefit of more evidence, Plaintiffs argue, courts have routinely placed undue emphasis on a single statistic: that 2.5 percent of Uber trips are interstate. *See Capriole*, 17 F.4th at 252-53 (noting only 2 percent of Lyft trips cross state lines). Through discovery, Plaintiffs have developed their own statistics which they say provide a more accurate picture of Uber drivers' engagement with interstate commerce. But the District Court considered Plaintiffs' new evidence and still found the 2.5 percent statistic persuasive. The core problem with Plaintiffs' evidence, which the District Court identified, is that it stresses the total volume of interstate trips to the exclusion of other types of evidence.

Singh focuses directly on the "141.5 million total interstate trips" Uber drivers made from 2010 through May 2020. Singh Br. 30. This statistic, however, cannot shed much light on Uber drivers' typical duties. A high number of

18

interstate trips does not mean that a class of workers is engaged in interstate commerce for purposes of § 1 if a small proportion of the class is responsible for most of the trips. Rather, to be central to a class of workers' job description, engagement with interstate commerce must be typical of the work that class members generally do.

Calabrese suggests a different statistic: the percentage of drivers who "provide 50 or more trips in a year." Calabrese Br. 4. Calabrese justifies his focus on drivers who make more than 50 trips by arguing that the § 1 analysis must take turnover into account. Since a minority of Uber drivers use the Uber app for more than six months, he contends, an accurate picture of Uber drivers' engagement with interstate commerce requires adjusting the raw statistics for turnover. He proposes we consider the 40 percent of drivers who work long enough to complete at least 50 trips in a year. Of this 40 percent, 35.1 percent have made at least one interstate trip.

We need not address how, or whether, the § 1 analysis should take turnover into account. Calabrese's statistics taken at face value undermine his point. His numbers reveal that even among the most active Uber drivers, a majority—nearly 65 percent—have never made a single interstate trip. On such evidence, it is easy to conclude that interstate trips are not a typical feature of class members' work.

We stress that this statistic is not dispositive. An occurrence may be central to a worker's job description even if it is rare. *See, e.g.*, *Islam v. Lyft, Inc.*, 524 F. Supp. 3d 338, 351 (S.D.N.Y. 2021) (observing that criminal trials are central to the work of district court judges even though they are infrequent occurrences). Uber drivers' interstate trips,

19

however, are incidental—take away interstate trips, and the fundamental character of Uber drivers' work remains the same. One trip may influence another tangentially, but each is discrete. *See Cunningham*, 17 F.4th at 251 (distinguishing engagement with the flow of interstate commerce from participation in independent transactions). Because it is not the act of crossing a state border alone that qualifies as engagement with interstate commerce for purposes of § 1, and drivers' interstate trips are largely unrelated to one another, Plaintiffs cannot show that drivers' rare trips across state lines are anything more than incidental to their intrastate work.

In addition to driver and trip data, Plaintiffs offer evidence of Uber's policies from the Technology Services Agreement. An employer's policies can be relevant to the § 1 analysis if they tend to show that the employer directed a single, unbroken stream of interstate commerce. Plaintiffs argue that Uber did just that. Plaintiffs' argument has an intriguing implication: that millions of discrete interstate trips, directed by one employer, can together form an unbroken stream of commerce. But § 1's focus is on a "class of workers," not employers. An employer's policies are only relevant insofar as they illuminate something about a class of workers' typical duties.

Accordingly, Plaintiffs' evidence of Uber's policies misses the mark. Stating that interstate trips are "integral to Uber's business and the fulfillment of its mission goals," Calabrese Br. 9, without more, does not explain much about drivers' actual work. A business undeniably engaged in interstate commerce may employ workers who are not so engaged. *See Saxon*, 142 S. Ct. at 1789 n.1 (leaving open the question of whether a class of workers who only supervise

20

cargo unloading would be exempt under § 1). If an individual worker is not personally engaged in interstate commerce, that worker must belong to a class of workers "whose occupation is . . . defined by its engagement in interstate commerce" in order to be exempt under § 1. *See Wallace*, 970 F.3d at 800.

Plaintiffs' evidence that Uber organizes drivers into multistate "territories" based on where they live and does not allow drivers to opt out of interstate trips shows that Uber anticipates at least some drivers crossing state lines. It does not demonstrate, however, that interstate trips are essential to drivers' activities.

When drivers sign up with Uber, they are assigned to either a multistate or a single-state territory, depending on where they live. Uber created these territories in response to variation in state and local regulations. Drivers assigned to multistate territories can pick up passengers in other states, while drivers assigned to single-state territories can only pick up passengers in that state. Drivers in a single-state territory will not receive ride requests while driving outside that state, unlike drivers in a multistate territory. All drivers must accept a ride request before learning the trip destination. Although drivers may cancel a trip, Uber may deactivate a driver's account if her cancellation rate is higher than average for her area. Drivers may not opt out of receiving ride requests that require interstate travel.

The existence of multistate territories and the lack of an opt-out feature could show that interstate travel is essential to drivers' work if paired with evidence that these policies impact drivers' actual work. Plaintiffs do not provide that extra evidence. It is unclear, for example, whether the day-to-day

21

work of drivers in multistate territories differs from that of drivers in single-state territories. It is also unclear whether the lack of an opt-out feature pressures drivers into taking interstate trips, given that only 17 percent of all Uber drivers completed one or more interstate trips in 2019.

In addition to arguing that interstate transport is integral to Uber's business, Plaintiffs challenge the idea that interstate trips can be local for § 1 purposes. Plaintiffs point to the fact that Uber authorizes would-be passengers to request a trip exceeding 100 miles. But they do not seriously contest Uber's claim that the average trip is far shorter—6.1 miles for all trips and 13.5 miles for interstate trips. Although average trip length is not dispositive, a short average trip length makes it more likely that drivers serve local communities that may, by happenstance of geography, cross state lines. *See Capriole*, 7 F.4th at 864 (citing *Rogers v. Lyft Inc.*, 452 F. Supp. 3d 904, 916 (N.D. Cal. 2020) ("Interstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers.")); *Omaha & Council Bluffs St. Ry. Co. v. Interstate Com. Comm'n*, 230 U.S. 324, 335-36 (1913) (holding that street railroads are not engaged in interstate commerce because they "are local . . . and for the use of a single community, even though that community be divided by state lines").

Finally, we reject Plaintiffs' argument that drivers who ferry passengers to and from airports are part of an integrated interstate transport effort. Plaintiffs point out that Uber has agreements with major airports authorizing drivers to drop off and pick up passengers at terminals. They also argue that airport trips are so closely related to interstate commerce as to bring rideshare drivers within the ambit of § 1. They connect

22

these arguments to the Supreme Court's decision in *United States v. Yellow Cab Co.*, which found that certain station-to-station taxi rides implicated interstate commerce. *See* 332 U.S. at 228-29.

We find this analogy unconvincing. The rides in *Yellow Cab* were part of an exclusive contract between a taxi service and the railroad—passengers bought a single ticket which included both the train and taxi portions of their journey. *Id.* at 228 Plaintiffs have pointed to no examples of a rideshare app which allows passengers to buy a single ticket that includes both flight and rideshare. Rather, rideshare trips to airports are done as part of drivers' "independent local service." *Yellow Cab*, 332 U.S. at 232-33. Such rides are not "part of interstate transportation." *Id.* at 233. *Yellow Cab* therefore seriously undermines Plaintiffs' argument, as our fellow courts have found. *See Capriole*, 7 F.4th at 863-64 (citing *Yellow Cab*, 332 U.S. at 228-29); *Cunningham*, 17 F.4th at 250-52 (same); *Osvatics*, 535 F. Supp. 3d at 19 (same); *Immediato*, 54 F.4th at 79 (same).

## IV.

Plaintiffs also object to the District Court's decision to compel arbitration on various contractual grounds. We reject these arguments.

## A.

Singh argues at length that "no contract to arbitrate" was formed between himself and Uber. Singh Br. 41-47. Singh could have raised this issue in his first appeal but did not. *See* Singh Br. 2, 5-6, 27, *Singh*, 939 F.3d 210 (No. 17-1397) (Aug.

23

13, 2018). In fact, Singh told us that Uber "required" him to accept the agreement. *Id.* at 27; *see also id.* at 5 ("Singh had to click a button that said, 'YES, I AGREE.'"). Having explicitly conceded the point in his first appeal, Singh may not now challenge the formation of the arbitration agreement. *See Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 263 (3d Cir. 2008) ("It is elementary that where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand." (quoting *Nw. Ind. Tel. Co. v. FCC*, 872 F.2d 465, 470 (D.C. Cir. 1989))).

Singh objects that Uber has failed to produce admissible evidence that he assented to the arbitration agreement. But Singh has admitted that he was presented with the agreement, and the court found that he accepted it. We discern no error in this finding, and no abuse of discretion in the court's evidentiary rulings.

B.

None of Plaintiffs' challenges to the validity of the arbitration clause are cognizable in this court. The contract says that all disputes "relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision . . . shall be decided by an Arbitrator and not by a court or judge." JA182-83. Courts call this type of provision a delegation clause—"an agreement to arbitrate threshold issues concerning the arbitration agreement." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). In the presence of a delegation clause, we "cannot reach the question of the arbitration agreement's enforceability" unless the clause itself "is not enforceable." *MacDonald v. CashCall, Inc*, 883 F.3d 220, 226 (3d Cir. 2018).

"A party contesting the enforceability of a delegation clause," as Singh does, "must 'challenge the delegation provision specifically.'" *Id.* (quoting *Rent-A-Center W.*, 561 U.S. at 70, 72).

Singh specifically challenges the delegation clause on two bases. We reject both. First, he argues the agreement has not made a "clear and unmistakable delegation of authority to the arbitrator," as is required. Singh Br. 57. This argument is based on the agreement's separate forum selection clause, which provides that disputes arising out of the agreement "shall be subject to the exclusive jurisdiction" of San Francisco's courts. Singh Br. 56; JA180. The Ninth Circuit, construing these precise provisions, rejected this argument. *Mohamed v. Uber Techs.*, 848 F.3d 1201, 1208-09 (9th Cir. 2016). So do we. The language in the two provisions is easily reconciled, and any conflict is "artificial." *Id.* at 1209. "It is apparent" that the forum selection clause here "was intended" to identify the proper venue for "an action in court to enforce" the agreement, and "to identify the venue for any other claims that were not covered by the arbitration agreement." *Id.* "That does not conflict with or undermine the agreement's unambiguous statement identifying arbitrable claims and arguments." *Id.*

Second, Singh claims the delegation clause is invalid because it is "subject to unilateral modification" and is "illusory." Singh Br. 45. The agreement, however, provides that any modifications will be conveyed in writing to the driver and become effective only if the driver consents by continuing to use the Uber app. These limitations on Uber's right to modify the agreement are sufficient to save it from being illusory. *Jaworski v. Ernst & Young U.S. LLP*, 119 A.3d 939, 947-49 (N.J. Super. Ct. App. Div. 2015) (holding that an

25

employee's continued employment after the amendment of an arbitration policy constituted consent to the policy); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 604 (3d Cir. 2002) (approving arbitration agreement as not illusory when employer's right to modify was conditional on "putting the change in writing, providing a copy to the employees, and allowing the employees to accept the change by continuing employment").[9]

---

[9] Whether or not a contractual provision is illusory—and the other contractual issues raised by the parties—are questions of state law. *See Collins v. Mary Kay, Inc.*, 874 F.3d 176, 182 (3d Cir. 2017); *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54 (2015) ("[T]he interpretation of a contract is ordinarily a matter of state law . . . ."). But which state's law applies? Singh argues that California law applies to the arbitration agreement. But his brief often makes arguments—including on this issue—based solely on the law of other states with no reference to California law. And in his previous appeal, Singh wrote to this Court that "New Jersey law controls" this case. Letter of Jan. 28, 2019, *Singh* (17-1397). Uber argues that the applicable law is the law of the various states where each Plaintiff lived and worked: Missouri, Nevada, New York, Ohio, Pennsylvania, and New Jersey.

To resolve this dispute, we apply the choice-of-law rules of New Jersey. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding federal courts should apply the choice of law rules of the forum state). Under those rules, "the first step is to determine whether an actual conflict exists" between the potentially applicable laws. *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008). The parties have pointed out no relevant differences in state law with respect to

26

## C.

Calabrese argues that some of his fellow FLSA plaintiffs "opted out of arbitration with Uber" and thus cannot be compelled to arbitrate. True enough, three plaintiffs did purport to exercise their right to opt out of arbitration under contracts with Uber in 2019, and one plaintiff did so in 2019 and 2020. But both of those agreements made clear that Plaintiffs would be "bound by an existing arbitration agreement" with Uber if they had accepted one in the past. Uber Br. 9; JA357-59. All three of the opt-out plaintiffs previously agreed to arbitration with Uber in 2015. They remain bound by that agreement notwithstanding their subsequent opt-out. *See Capriole*, 7 F.4th at 859 n.2.[10]

---

this issue. Instead, they all argue from general principles, typically with reference to federal and New Jersey cases. Our own examination of the cases similarly reveals no relevant distinctions. *See Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776-77 (Mo. 2014); *Baldonado v. Wynn Las Vegas, LLC*, 194 P.3d 96, 105-06 & n.39 (Nev. 2008); *Bassett v. Elec. Arts, Inc.*, 93 F. Supp. 3d 95, 106-08 (E.D.N.Y. 2015) (applying New York law); *Jones v. Carrols, LLC*, 119 N.E.3d 453, 464-65 (Ohio Ct. App. 2019); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603-04 (3d Cir. 2002) (applying Pennsylvania law); *Jaworski v. Ernst & Young U.S. LLP*, 119 A.3d 939, 948-49 (N.J. Super. Ct. App. Div. 2015). As such, we see "no choice-of-law issue to be resolved." *Camp Jaycee*, 962 A.2d at 460.

[10] We take no position on whether plaintiffs must arbitrate claims arising after they exercised their right to opt out. As plaintiffs are bound in some sense by the 2015 agreement, which delegates the question of arbitrability to the arbitrator,

The parties' contract forecloses Calabrese's argument. The agreement says that the driver can "opt out of *this* Arbitration Provision," but may be "bound by an existing agreement to arbitrate disputes." Calabrese Br. 23-24; JA450 (emphasis added). Calabrese argues that our interpretation makes opting out of arbitration illusory. We disagree. Plaintiffs had a meaningful right to opt out of every agreement that they were presented with. We are sympathetic to Plaintiffs' point. No doubt Uber's requirement that they opt out of each new agreement is "more burdensome" than a permanent opt-out right. *Mohamed*, 848 F.3d at 1211. Ultimately, though, we agree with the Ninth Circuit that "the contract bound Uber to accept opt-outs from those drivers who followed the procedure it set forth. There were some drivers who did opt out and whose opt-outs Uber recognized. Thus, the promise was not illusory." *Id.*

\*\*\*

We will affirm the judgment of the District Court.

---

we must compel arbitration and leave the determination of whether any particular dispute is within the scope of the agreement to the arbitrator.

28