Filed 6/25/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LUIS BETANCO,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LIVING SPACES FURNITURE,<br>LLC, et al.<br><br>    Defendants and Appellants. | A169754, A169755<br><br>(Alameda County<br>Super. Ct. No. RG21111630) |
| LUIS BETANCO,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LIVING SPACES FURNITURE,<br>LLC, et al.<br><br>    Defendants and Appellants. | A169756, A169768<br><br>(Alameda County<br>Super. Ct. No. 21CV003410) |

After respondent Luis Betanco filed a class action lawsuit and a separate action under the Labor Code Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.) against appellants Living Spaces Furniture, LLC (Living Spaces) and Of Service Transportation, LLC (Of Service), appellants filed a motion to compel arbitration. The trial court granted in part and denied in part the motion. Appellants first contend that the court erred in concluding that Betanco was a "transportation worker" under section 1 of the Federal Arbitration Act (FAA, 9 U.S.C. § 1 et seq.) and thus exempt from the Act. We reject the contention because Betanco was

1

actively engaged in the interstate transportation of goods even though he made retail (as opposed to wholesale) deliveries. We also reject appellants' second contention that the trial court was required to dismiss Betanco's non-individual PAGA claims.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Living Spaces is a chain furniture store. It has both stores and distribution centers in multiple states, including California. Merchandise sold in stores is manufactured both inside and outside the state, including in Mexico, before it is shipped to Living Spaces stores and two distribution centers in California (one in Rialto, and one in Fremont). It contracts with delivery-service providers, including Of Service, to arrange delivery of its products from distribution centers to customers.

In summer 2018, respondent Luis Betanco started working for Of Service as a delivery driver who delivered furniture from Living Spaces' warehouse to customers. The following year, in August 2019, he signed an independent contractor agreement between his business (Betanco Trucking, Inc.) and Of Service that governed his delivery services. The agreement includes an arbitration clause which provides that "any dispute, claim or controversy between [Of Service] and [Betanco Trucking] arising out of or relating to any interpretation, construction, performance or breach" of their agreement would be settled by binding arbitration in Riverside County in accordance with the then-current rules adopted by the arbitration company selected by the parties. The clause further provides that, "[t]o the fullest extent permitted by law," the parties "shall not join or consolidate claims submitted for arbitration under this Agreement with those of any other persons or entities, and that no form of class, collective, or representative

2

action shall be maintained without the mutual consent of the Parties." The arbitration provision is to be governed by the FAA. Living Spaces is not a signatory to the agreement but later argued that Betanco's suit against it is covered by the agreement since the company is an intended beneficiary.

Betanco stopped working for Of Service in August 2021 after he complained about working long hours for insufficient pay.

Betanco filed two separate lawsuits against Living Spaces and Of Service that are the subject of these consolidated appeals. The first was a class action filed in September 2021 (the Class Action). The Class Action alleged various violations of the Labor Code, including failure to pay minimum wage and overtime, failure to authorize and permit meal and rest periods, and unlawful wage deductions. The complaint was brought on behalf of Betanco and "[a]ll non-employee individuals who performed delivery services for [appellants] as a Contract Carrier, Driver, and/or Helper in the State of California."

The second complaint was filed in December 2021 seeking civil penalties under PAGA for Labor Code violations (the PAGA Action). The action was brought on behalf of Betanco "and . . . other aggrieved employees." Both defendants filed answers to each of the two lawsuits.

Around a year and a half after the initiation of litigation (which included an eight-month period when the litigation was stayed while the parties attempted to mediate), Living Spaces and Of Service brought what has been referred to as an "omnibus" petition to arbitrate, meaning it applied to both actions. The petition sought to compel arbitration of all of Betanco's claims and to dismiss his non-individual (representative) PAGA causes of action under *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639 (*Viking River*).

3

In its moving papers, Living Spaces argued that furniture deliveries by drivers such as Betanco were local in nature and isolated from interstate commerce. The company's director of consumer delivery acknowledged in a declaration that the merchandise the company sells in California is manufactured both inside and outside the state. But he pointed out that the independent contractors hired to make deliveries through intermediaries such as Of Service delivered furniture from distribution centers located in California to California customers. The director attested that Living Spaces customers can purchase products both by shopping in a store or online through the company's website. After making a purchase, a customer may choose from among multiple delivery options, including having the product shipped to them or picking it up at a Living Spaces store or distribution center. When a customer requests that an item be shipped, Living Spaces contracts with third-party delivery services such as Of Service, which in turn hires drivers such as Betanco to deliver the merchandise.

In a supplemental declaration submitted with reply papers, the director explained that deliveries "are made only after individual orders are placed with [Living Spaces] by customers within California. These orders are fulfilled from merchandise in [Living Spaces'] inventory that it maintains at its distribution centers in California. The [independent operators] do not work in [Living Spaces'] distribution centers. They are never responsible for shipping, processing, or receiving goods at [Living Spaces'] distribution centers; nor do they move, stage, pick, or relocate product within [Living Spaces'] distribution centers. . . . The [independent operators] simply load the picked and staged furniture items from the loading dock into their own trucks for them to be able to fulfill [Living Spaces] customer orders by

4

delivering the items to [Living Spaces] customers in the area surrounding the California distribution center from which the items originated."

Betanco opposed the motion. He argued that arbitration was improper under the FAA since he is a transportation worker engaged in interstate commerce and thus exempt from FAA coverage. (9 U.S.C. § 1.) And he argued that *Viking River* did not apply to his complaints because he was exempt.

The trial court granted in part the motion to compel. It first concluded that even though Living Spaces was not a signatory to the arbitration agreement, Betanco was equitably estopped from opposing arbitration on that basis since he alleged that he was an employee of the company and working as its agent. It then concluded that Living Spaces and Of Service did not waive the right to arbitrate as Betanco had argued since their actions had been "largely consistent with the right to arbitrate." And the court further found that the arbitration agreement was not unconscionable. The parties on appeal do not challenge the trial court's ruling on these issues.[1]

The trial court agreed with Betanco, though, that he was a transportation worker engaged in interstate commerce (9 U.S.C. § 1) and thus exempt from the FAA. The court then turned to state-law principles to determine whether to enforce the agreement. It concluded that Betanco had failed to show that the class-arbitration waiver was unenforceable under *Gentry v. Superior Court* (2007) 42 Cal.4th 443 and thus declined to strike the class waiver from the arbitration agreement. But the court concluded

---

[1] Betanco sought review of the trial court's decision on waiver by petition for a writ of mandate or other appropriate review, but this court summarily denied the petition. (*Betanco v. Superior Court* (petn. den. Feb. 29, 2024, A169724).)

5

that Betanco's claims for unpaid wages could be pursued in court under Labor Code section 229, notwithstanding the arbitration agreement.[2]

The trial court next denied appellants' motion to dismiss Betanco's PAGA claims that were brought in his representative capacity, since Betanco maintained standing to pursue such claims under *Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104 (*Adolph*). But it ordered those claims stayed until after Betanco arbitrated his individual PAGA claims.

The effect of the trial court's order was to send the following causes of action to arbitration: reimbursement of employee expenses, failure to furnish accurate wage statements, and unfair competition. And, as we have said, the court ordered Betanco to arbitrate his individual PAGA claims (as opposed to the ones asserted in a representative capacity). The court stayed both the Class Action and the PAGA Action pending the outcome of arbitration.

---

[2] Specifically, the court found that Betanco's causes of action for failure to pay minimum wage, failure to pay overtime compensation, unlawful deduction from wages, failure to provide meal periods, and failure to authorize and permit rest periods were subject to Labor Code section 229, regarding enforcing claims for unpaid wages without regard to any arbitration agreement. But the court concluded that Betanco's causes of action for reimbursement of employee expenses, failure to furnish accurate wage statements, and unfair competition were not claims for unpaid wages and thus not exempt from arbitration under section 229.

Living Spaces and Of Service appealed in both the Class Action and the PAGA Action. No. A169754 is Living Spaces' appeal in the Class Action,[3] No. A169755 is Of Service's appeal in the Class Action, No. A169756 is Living Spaces' appeal in the PAGA Action, and No. A169768 is Of Service's appeal in the PAGA Action. This court granted the joint motion to consolidate all four appeals. Appellants submitted joint opening and reply briefs.

After oral argument, and at appellants' request, this court delayed submission until after the United States Supreme Court issued its opinion in *Flowers Foods, Inc. v. Brock* (2026) 608 U.S. __ (*Flowers*) [146 S.Ct. 1358] and the parties were afforded the opportunity to file supplemental briefs.[4]

---

[3] We asked the parties in No. A169754 to submit briefs on whether the order was appealable, then deferred ruling on the issue. Code of Civil Procedure section 1294, subdivision (a), provides that an aggrieved party may appeal from "[a]n order dismissing or denying a petition to compel arbitration." "Because an order denying a petition to compel arbitration is appealable, we may review the portion of the trial court's order denying [appellants'] motion to compel arbitration of [Betanco's] cause[s] of action for unpaid wages." (*Muller v. Roy Miller Freight Lines, LLC* (2019) 34 Cal.App.5th 1056, 1061 (*Muller*).)

[4] This court directed the parties to file supplemental briefs "on the effect of the [*Flowers*] decision on these consolidated appeals." Appellants' supplemental brief acknowledges that the holding in *Flowers*—that a worker may qualify as one engaged in interstate commerce even if the worker never personally crosses state lines (*Flowers*, *supra*, 146 S.Ct. at p. 1365)—is a "narrow" one. Appellants nonetheless devote nearly 27 pages to arguing why Betanco does not qualify as a transportation worker. In doing so, they advance arguments that were not raised in their previous appellate briefs. "We decline to consider the[se] argument[s] under the rule that an appellant's failure to raise an issue in its opening brief waives it on appeal." (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1345, fn. 6 [declining to address issue that went beyond subject of request for supplemental briefing and was not addressed in opening brief].)

II.

DISCUSSION

*A. Because Betanco Is a Transportation Worker, the Arbitration Agreement He Signed Is Exempt from the FAA.*

Appellants contend that the trial court erred when it concluded that Betanco is a "transportation worker" and thus exempt from the FAA under section 1 of the FAA.  Reviewing this question of law de novo as the facts are undisputed (*Nieto v. Fresno Beverage Co., Inc.* (2019) 33 Cal.App.5th 274, 279 (*Nieto*)), we agree with the trial court that Betanco is a transportation worker since he was actually engaged in the transportation of goods in their interstate journey to customers.

Congress enacted the FAA in 1925 in response to courts' hostility to the enforcement of arbitration agreements.  (*Circuit City Stores v. Adams* (2001) 532 U.S. 105, 111 (*Circuit City*).)  "To give effect to this purpose, the FAA compels judicial enforcement of a wide range of written arbitration agreements."  (*Ibid.*)  The FAA's coverage provision "compels judicial enforcement of a wide range of written arbitration agreements" (*ibid.*), namely, any "written provision in . . . a contract evidencing a transaction *involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction."  (9 U.S.C. § 2, italics added.)  The U.S. Supreme Court has long interpreted the phrase "involving commerce" to indicate "Congress' intent 'to exercise [its] commerce power to the full.' " (*Circuit City*, at p. 112.)

We are concerned here, "not [with] the basic coverage authorization under [section] 2 of the [FAA], but the exemption from coverage under [section] 1."  (*Circuit City*, *supra*, 532 U.S. at p. 112.)  That exemption provides that the FAA shall not apply "to contracts of employment of seamen, railroad employees, or *any other class of workers engaged in foreign or*

8

*interstate commerce.*" (9 U.S.C. § 1, italics added.) This catchall phrase applies only to "transportation workers." (*Circuit City* at p. 119.) "The Supreme Court reasoned the plain meaning of ' "engaged in" ' interstate commerce in section 1 is narrower in scope than the open-ended phrase ' "involving" ' commerce in section 2. (*Circuit City*, *supra*, 532 U.S. at pp. 118–124.) Unlike section 2's reference to 'involving commerce,' which 'indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause' and thus is afforded an 'expansive reading,' section 1's reference to 'engaged in commerce' is 'narrower,' and therefore 'understood to have a more limited reach,' requiring 'a narrow construction' and a 'precise reading.' (*Circuit City*, at pp. 114, 115, 118–119.)" (*Muller*, *supra*, 34 Cal.App.5th at p. 1062.) In short, "while the basic coverage provision of the FAA (9 U.S.C. § 2) uses the broadly inclusive 'involving commerce' standard, the scope of the transportation worker exemption (9 U.S.C. § 1) is limited by the narrower 'engaged in' interstate commerce standard." (*Nieto*, *supra*, 33 Cal.App.5th at p. 280.) Stated differently, "while [section] 2 expands the FAA's reach to the full extent of Congress's commerce power, [citation] [section] 1 carves out a narrow exception from the FAA for a small number of workers who otherwise would fall within [section] 2's ambit." (*Wallace v. Grubhub Holdings, Inc.* (7th Cir. 2020) 970 F.3d 798, 803 (*Wallace*).)

"The term 'transportation worker' was not at issue in *Circuit City*, so the Supreme Court did not adopt a specific definition," and state and federal courts have struggled with defining the term ever since. (*Muller*, *supra*, 34 Cal.App.5th at p. 1063.) Applying recent state-court decisions such as *Nieto* and *Muller*, as well as the high court's recently decided *Flowers*, Betanco qualifies as a transportation worker under section 1 of the FAA. As

9

*Flowers* reaffirmed, our focus must be on whether Betanco played "a 'direct,' 'necessary,' and 'activ[e]' role in moving goods across borders," which Betanco no doubt did by loading and unloading furniture that was in the stream of interstate commerce. (*Flowers, supra*, 146 S.Ct. at p. 1365.)

The plaintiff in *Nieto* was a delivery driver for a beverage distributor that bought beverages both nationally and internationally. (*Nieto, supra*, 33 Cal.App.5th at pp. 276–277.) The distributor argued that the transportation-worker exemption did not apply to the driver since he delivered products only within California (from a warehouse to retail establishments) and did not cross state lines. (*Id.* at p. 278.) The court rejected the argument that the intrastate nature of the driver's deliveries barred the transportation-worker exemption, since " '[i]ntrastate deliveries of goods are considered to be part of interstate commerce if the deliveries are merely a continuation of an interstate journey. [Citations.] Goods arriving from out of state that are unloaded and held in a warehouse before being loaded onto trucks and delivered to customers do not terminate their interstate journey if "there is a practical continuity of movement of the goods until they reach the customers for whom they are intended." ' " (*Id.* at p. 283.) Because the plaintiff driver's "deliveries, although intrastate, were essentially the last phase of a continuous journey of the interstate commerce . . . being transported until reaching its destination(s) to [the defendant's] customers," he was "engaged in interstate commerce through his participation in the continuation of the movement of interstate goods to their destinations." (*Id.* at p. 284.) The same is true here, as Betanco was part of the continuation of movement of furniture from outside the state to customers in California.

A similar conclusion was reached in *Muller*, where the plaintiff was a truck driver for a motor carrier company that hired drivers to transfer freight—99 percent of which originated from outside the state—to and from its six California terminals to various destinations in the state. (*Muller*, *supra*, 34 Cal.App.5th at p. 1060.) The court acknowledged federal cases that have held that delivery drivers are not considered transportation workers. (*Id.* at pp. 1067–1068.) But it concluded that, despite the apparent split in authority, the plaintiff was " ' " 'actually engaged in the movement of goods in interstate commerce' " ' " under *Circuit City*, *supra*, 532 U.S. at page 112, since the plaintiff "played an integral role in transporting those goods through interstate commerce" and thus was exempt from FAA coverage. (*Muller* at pp. 1068–1069.) "The intrastate nature of [an employee's] work . . . should not be viewed in a vacuum" and instead the " 'classification for purposes of § 1 [should be reached] after a case-by-case, factual determination.' " (*Id.* at p. 1069.)

More recently, our colleagues in Division Three of this court followed *Nieto* in upholding a finding that a " 'last-mile' delivery company whose primary client was online retailer Amazon.com" was exempt from the FAA because the company was a transportation worker engaged in interstate commerce. (*Betancourt v. Transportation Brokerage Specialists, Inc.* (2021) 62 Cal.App.5th 552, 554 (*Betancourt*).) The court rejected the defendant's arguments why *Nieto* should not be applied. (*Betancourt* at pp. 559–560.) Its holding was consistent with federal cases that have held that "Amazon last-mile delivery drivers are 'engaged in interstate commerce' because their 'transportation of goods wholly within a state are still a part of a continuous interstate transportation.' " (*Id.* at p. 561, quoting *Rittmann v. Amazon.com, Inc.* (9th Cir. 2020) 971 F.3d 904, 916 (*Rittmann*); see also *Doss v. Tesla, Inc.*

11

(June 11, 2026, A173210) __ Cal.App.5th __ [yard hostelers whose work is performed entirely on factory grounds were transportation workers since their actions were "a necessary step in the completion of the interstate journey" of auto parts] & *Waithaka v. Amazon.com, Inc.* (1st Cir. 2020) 966 F.3d 10, 26.)

We disagree with appellants' assertion that the trial court somehow "misread" four decisions (*Rittmann, Betancourt, Nieto*, and *Carmona Mendoza v. Domino's Pizza, LLC* (9th Cir. 2023) 73 F.4th 1135 (*Carmona Mendoza*) "to make them outliers that conflict with both United States Supreme Court precedent and decisions of all other federal appellate courts." They insist that there is a clear distinction to be made for purposes of section 1 between drivers whose intrastate journey delivers items that were ordered in California from out of state, and those drivers who deliver items ordered only after they have arrived in the state. In other words, appellants apparently recognize that drivers who make so-called "last mile deliveries" (e.g., *Rittmann, supra*, 971 F.3d at p. 909) are considered transportation workers for purposes of section 1. But they contend that a driver who transports items intrastate that were ordered from California warehouses after they arrived in the state following an interstate journey do not qualify as transportation workers for purposes of the statute. We disagree that there is such a bright-line distinction. (See *Flowers, supra*, 146 S.Ct. at p. 1366 [dismissing arguments based on facts discussed "in passing" where petitioner did not ask court "to decide their legal significance" but instead "venture[d] all upon one cast"].)

In *Rittmann*, the Ninth Circuit considered the role of plaintiff drivers who contract with a subsidiary of Amazon and use their personal vehicles to deliver products from Amazon warehouses to the products' destinations.

(*Rittmann, supra*, 971 F.3d at p. 907.) The court concluded that even though most of the plaintiffs' deliveries took place intrastate, they were part of a continuous movement of interstate commerce (*id.* at p. 915), the workers "form[ed] a part of the channels of interstate commerce" (*id.* at p. 917), and they were thus exempt from the FAA. In reaching this conclusion, the court noted that "Amazon packages do not 'come to rest[]' at Amazon warehouses, and thus the interstate transactions do not conclude at those warehouses. The packages are not held at warehouses for later sales to local retailers; they are simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys. The interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations, and thus [plaintiff] drivers are engaged in the movement of interstate commerce." (*Id.* at p. 916.)

Appellants attempt to distinguish *Rittmann* by arguing that here, the furniture Betanco delivered had already come to rest by the time it was delivered to a warehouse, and the only reason Betanco became involved was because the furniture was too bulky for a customer to carry it out of a store. At the hearing on appellants' motion, the trial court rejected this approach, stating that appellants' counsel was assuming that in *Rittmann*, items were transported to a warehouse from out of state only after a customer placed an order, and the plaintiff drivers were simply continuing the items' interstate journeys. The reality with Amazon deliveries may very well be, according to the trial court, that "Amazon has these fulfillment centers and they keep crates and crates of Coca-Cola and crates and crates of aspirin. And so when somebody in San Francisco orders aspirin, the local delivery driver goes, picks up that aspirin, it's just been siting there for a moment knowing that

13

somebody in San Francisco is going to order aspirin or Coca-Cola, and delivers it the last mile." In other words, *Rittmann* focused on the plaintiff drivers' role in products' journeys, and not on when customers ordered the items. In any event, Living Spaces acknowledges that at least some of its furniture orders are placed online.

*Rittmann* distinguished the delivery of Amazon packages to their final destinations from the delivery of live poultry to slaughterhouses in *A.L.A. Schechter Poultry Corp. v. United States* (1935) 295 U.S. 495. (*Rittmann, supra*, 971 F.3d at p. 916.) Unlike the packages at Amazon warehouses, the live birds in *Schechter Poultry* " 'came to rest' when they reached slaughterhouses for 'slaughter and local sale to retail dealers and butchers who in turn sold directly to consumers.' " (*Rittmann* at p. 916, quoting *Schechter Poultry* at p. 543.) "Once the poultry reached the slaughterhouses, any further 'commerce' involving the poultry required new or subsequent transactions, all of which took place within the state of the slaughterhouse. Those transactions thus marked the dividing line between interstate and intrastate commerce." (*Rittmann* at p. 916; see *Schecter Poultry* at pp. 542–543.) Appellants here apparently contend that the delivery of furniture to Living Spaces warehouses—before delivery drivers such as Betanco become part of the process—is an equivalent dividing line between interstate and intrastate commerce, but we disagree. The live animals in *Schecter Poultry* were killed before being sent to their next destinations, and this alteration meant they were not part of a continuous process of moving the same product from one place to the other, such as in *Rittmann*. We find the unaltered furniture at issue here more akin to the Amazon packages in *Rittmann* than the poultry in *Schecter Poultry*.

14

We also disagree with appellants' apparent contention that this case is similar to cases involving food-delivery drivers. We certainly agree with the observation "any interstate journey of an ingredient used to prepare restaurant food ends when it reaches its customer: the restaurant." (*Betancourt*, *supra*, 62 Cal.App.5th at p. 559; see also *Immediato v. Postmates, Inc.* (1st Cir. 2022) 54 F.4th 67, 71, 78 [courier plaintiffs delivered from restaurants and businesses items whose interstate journey had ended when they arrived at those businesses, and the plaintiffs were part of "entirely new and separate transactions"].) Again, though, taking raw ingredients that have been delivered from out of state and transforming them into food that will be delivered locally is far different from delivering pieces of furniture that are in the same condition when they are deposited in a warehouse as when drivers such as Betanco deliver them to the final customer.

The trial court here also relied on *Carmona Mendoza*, *supra*, 73 F.4th 1135, which involved the delivery of pizza ingredients from Domino's Pizza to its franchisees. (*Id.* at p. 1136.) Domino's bought ingredients from suppliers outside of California and delivered them to a supply center in the state, where Domino's employees reapportioned, weighed, and packaged the ingredients for delivery to local franchisees but did not otherwise alter them. (*Ibid.*) The plaintiff delivery drivers then delivered those ingredients from the supply center to franchisees. (*Ibid.*) In concluding that the plaintiffs were exempt as transportation workers, the Ninth Circuit stressed the importance of "focus[ing] heavily on what the class of workers to which the plaintiffs belong[] *actually did*" (*id.* at p. 1138, italics added) and acknowledged that "the *critical question* is whether the workers are actively 'engaged in transportation' of goods in interstate commerce and play a 'direct

15

and necessary role in the free flow of goods across borders.' " (*Id.* at p. 1137, quoting *Southwest Airlines Co. v. Saxon* (2022) 596 U.S. 450, 458, italics added.) Appellants claim that the trial court "stretched the rationale of [*Carmona Mendoza*] to the breaking point" since the Ninth Circuit case involved wholesale transactions, not retail sales. While it may be true that wholesale transactions were involved in *Carmona Mendoza*, again, the court looked to the drivers' actual role in delivering those goods—as opposed to whether the goods were wholesale or retail—in determining whether the plaintiffs were transportation workers. And the court specifically stressed that " '[t]he issue is not how the purchasing order is placed, but rather whether the . . . drivers operate in a single, unbroken stream of interstate commerce that renders interstate commerce a central part of their job description.' [Citation.] Indeed, the Supreme Court has long rejected the notion *that the timing of an order is itself dispositive of whether goods remain in the stream of interstate commerce.*" (*Carmona Mendoza* at p. 1138, italics added; see *Walling v. Jacksonville Paper Co.* (1943) 317 U.S. 564, 570.) As the trial court observed, Betanco was engaged in the actual transportation of furniture that was intended from the outset of its interstate journey to be delivered to customers, just as the drivers in *Carmona Mendoza* delivered items whose "ultimate intended destination" was inside the state.

Appellants likewise contend that *Nieto*, *supra*, 33 Cal.App.5th 274, is distinguishable since it also involved deliveries of wholesale products (alcoholic beverages) from a warehouse to retailers. (*Id.* at p. 284.) Although *Nieto* may have involved wholesale deliveries, the court also focused on the fact the defendant company and its drivers (including the plaintiff) were subject to and required to comply with Department of Transportation regulations as well as other federal laws and regulations governing motor-

16

vehicle safety, and the drivers traveled on interstate highways (*ibid.*)—which is no doubt true for Betanco as well. As in other cases where courts concluded the plaintiffs were transportation workers, *Nieto* ultimately focused on whether the drivers "participat[ed] in the continuation of the movement of interstate goods to their *destinations*," which, again, is exactly what Betanco did here. (*Ibid.*, italics added.)

We do not find persuasive the federal cases upon which appellants rely. They point to *Lopez v. Cintas Corp.* (5th Cir. 2022) 47 F.4th 428, 430, which held that a delivery driver who picked up items delivered from out of state and stored in a warehouse and then delivered the items to local customers was not a transportation worker exempt from the FAA's coverage. The court concluded that once the goods arrived at a Texas warehouse and were unloaded, "anyone interacting with those goods was no longer engaged in interstate commerce," especially since the local driver there "ha[d] a more customer-facing role" than seamen or railroad employees (the other workers specifically referred to in section 1 of the FAA). (*Lopez* at p. 433.) The court noted, though, that "sister circuits that have addressed this issue have *come out different ways*."[5] (*Id.* at p. 432.) Like the trial court, we find more persuasive the California cases that have analyzed whether the goods involved are part of a continuous part of interstate transportation.

Appellants also rely heavily on *Hamrick v. Partsfleet, LLC* (11th Cir. 2021) 1 F.4th 1337, which involved a driver/courier who used his personal car to deliver items for a national company's warehouse to their final destinations. (*Id.* at pp. 1340–1341.) The 11th Circuit held that the district

---

[5] Because multiple cases have noted splits in authority, we reject appellants' characterization of "the overwhelming weight of federal authority" having reached a "consensus" on the issue. (Formatting omitted.)

court erred when it concluded that the worker was exempt simply by virtue of delivering goods that had previously traveled interstate. (*Id.* at pp. 1349, 1351.) The proper focus was on whether such a driver had actually engaged in the transport of goods interstate. (*Id.* at pp. 1349–1350.) The 11th Circuit did not actually determine whether the delivery driver had engaged in such transportation but instead remanded the case for the district court to apply the correct analysis. (*Id.* at pp. 1351–1352.) We agree with appellants insofar as they rely on *Hamrick* to argue that courts should focus on whether a worker is actually engaged in the transportation of goods, and not simply the origin of the goods themselves. But the trial court here engaged in such an analysis. It ultimately concluded that the goods Betanco moved were inevitably destined from the outset of their interstate journey for their California customers even if they paused in a warehouse before Betanco moved them, and he was thus engaged in interstate commerce.

We likewise are not persuaded by appellants' reliance on *Wallace*, *supra*, 970 F.3d 798, where the 7th Circuit held that food-delivery drivers were not a class of workers engaged in interstate commerce. (*Id.* at pp. 799, 803.) The plaintiffs in *Wallace* focused on the fact that some of the food they delivered had crossed state lines at some point, and they also stressed that their employment agreements involved commerce for purposes of section 2 of the FAA. (*Wallace* at pp. 802–803.) The court rejected the latter argument since, as we have said, section 1 is narrower than section 2. (*Wallace* at p. 803.) And it concluded that the plaintiffs were not exempt as transportation workers since they "did not even try" to show "that the interstate movement of goods [was] a central part of the job description of the class of workers to which they belong." (*Ibid.*) Here, by contrast, Betanco *did* make such a showing. And in any event, we disagree with appellants'

18

broader argument that Betanco's role in commerce delivering furniture from a warehouse "differs in no material respect form the role of grocery clerks who carry bags of purchased groceries to customers' cars, employees at fast-food restaurant drive-through windows who transfer purchased meal items to customers in their cars outside the restaurant, and employees at home-improvement stores that help customers carry out bulky items like lumber and outdoor grills." Nor would the trial court's analysis "sweep in numerous categories of workers whose occupations have nothing to do with interstate transport—for example, dry cleaners who deliver pressed shirts manufactured in Taiwan and ice cream truck drivers selling treats made with milk from an out-of-state dairy" (*id.* at p. 802), as appellants claim.

We agree with the trial court that because Betanco was engaged in delivering goods that were inevitably destined from the outset of their interstate journey to the customers where Betanco delivered them, he was a transportation worker and thus the arbitration agreement he signed was exempt under section 1 of the FAA.

### B. *Betanco Has Established Standing to Pursue His Non-individual PAGA Claims in Court.*

Appellants next challenge the trial court's conclusion that Betanco's representative PAGA claims could be litigated in court. Because *Adolph*, *supra*, 14 Cal.5th 1104, is directly on point and dictates the outcome, we affirm.

"The Legislature enacted PAGA [more than] two decades ago in response to widespread violations of the Labor Code and significant underenforcement of those laws." (*Adolph*, *supra*, 14 Cal.5th at p. 1116.) PAGA "create[d] new civil penalties for various Labor Code violations and ' " . . . allow[ed] aggrieved employees, acting as private attorneys general, to

19

recover [those] penalties." ' [Citation.]  An employee who brings a PAGA action to recover civil penalties acts ' "as the proxy or agent" ' of the state." (*Ibid.*)  "To have standing to bring a PAGA action, a plaintiff must be an 'aggrieved employee,' which the statute defines as 'any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed.' ([Lab. Code, ]§ 2699, subd. (c)[2].)"  (*Ibid.*)

In *Viking River*, the U.S. Supreme Court held that the FAA required that courts enforce arbitration agreements insofar as they mandate arbitration of a plaintiff's individual PAGA claims.  (*Viking River*, *supra*, 596 U.S. at p. 662.)  Appellants relied heavily on *Viking River* in their motion to compel arbitration.  On the same day that appellants submitted their reply papers, our Supreme Court issued *Adolph*, *supra*, 14 Cal.5th 1104.  The court held that an employee who has been compelled to arbitrate individual PAGA claims under *Viking River* maintains statutory standing to pursue non-individual (i.e., class, collective or representative, see *Adolph* at pp. 1113–1114) PAGA claims in court.  (*Id.* at pp. 1119, 1121, 1123.)  "[W]here a plaintiff has filed a PAGA action comp[osed] of individual and non-individual claims, an order compelling arbitration of individual claims does not strip the plaintiff of standing to litigate non-individual claims in court."  (*Id.* at p. 1123.)  The trial court relied on *Adolph* when it concluded that Betanco maintained standing to pursue in court PAGA claims concerning events involving other employees.

On appeal, appellants continue to rely heavily on *Viking River* and delay around nine pages into their opening brief's section on PAGA standing to address *Adolph*.  They claim *Adolph* does not support the trial court's ruling since the Supreme Court "simply recognized a distinction between 'individual and non-individual claims' in PAGA actions."  But again, *Adolph*

20

did more than recognize a distinction between the two types of actions. It held that where, as here, "a plaintiff has brought a PAGA action comprising individual and non-individual claims, an order compelling arbitration of the individual claims *does not strip the plaintiff of standing as an aggrieved employee to litigate claims on behalf of other employees under PAGA*." (*Adolph*, *supra*, 14 Cal.5th at p. 1114, italics added.)

Appellants claim that *Adolph* does not apply here since all independent drivers for Living Spaces were required to sign arbitration agreements waiving the right to litigate claims on a class or representative basis, and that the FAA "protects [all] these agreements to arbitrate from state interference." They rely on *Perry v. Thomas* (1987) 482 U.S. 483, which held that the FAA preempts Labor Code section 229's requirement that plaintiffs be able to litigate their wage disputes in court. (*Perry* at pp. 490–491.) But *Perry* is of little assistance here since it was decided before PAGA's enactment and did not involve a transportation worker who was exempt under section 1 of the FAA.

According to appellants, "[n]either *Adolph* nor *Viking River* held that the FAA permits claims in court on behalf of employees who agreed to arbitrate their own claims. These decisions considered only the impact of the plaintiff-employee's *own* arbitration clause; neither decision had occasion to consider the impact other employees' arbitration agreements have on pursuing representative PAGA claims." This overlooks the fact that representative PAGA claims are undertaken on behalf of *the state*. "An employee suing under PAGA 'does so as the *proxy or agent of the state's labor law enforcement agencies*.' [Citation.] Every PAGA claim is 'a dispute between an employer and the *state*.'" (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 81.) Just as an employer cannot force the state to

21

arbitrate, nor can it foreclose a representative PAGA action because employees have submitted to arbitration agreements. *Adolph* itself considered the overarching purpose of PAGA—" ' "to augment the limited enforcement capability of the [Labor and Workforce Development Agency] by empowering employees to enforce the Labor Code as representatives of the Agency" ' "—and stressed that "[t]he Legislature enacted PAGA on the premise that Labor Code violations sustained by the plaintiff employee are often only a fraction of the violations committed by an employer that is engaged in unlawful workplace practices." (*Adolph*, *supra*, 14 Cal.5th at p. 1122.) Under PAGA, an aggrieved employee—one who was employed by the alleged violator and against whom one or more of the alleged violations was committed, see Labor Code section 2699, subdivision (c)(1)—has PAGA standing. (See *Kim* at pp. 81–82.) At this stage of the pleadings, Betanco has established such standing, and the fact that other workers entered into arbitration agreements does not alter that fact.[6] As the trial court correctly applied *Adolph*, we will not set aside its order denying appellants' motion to dismiss Betanco's non-individual PAGA claims.

## III.
### DISPOSITION

The order challenged in Nos. A169754, A169755, A169756, A169768 is affirmed. Respondent is awarded appellate costs.

---

[6] *Adolph* recognized that if an arbitrator concludes in arbitration that a plaintiff is not an aggrieved employee and the determination is reduced to a final judgment after a petition to confirm an arbitration, that plaintiff would lose standing to prosecute non-individual claims. (*Adolph*, *supra*, 14 Cal.5th at p. 1124.)

_____

Humes, P.J.

WE CONCUR:

_____

Banke, J.

_____

Smiley, J.

*Betanco v. Living Spaces Furniture, LLC, et al.*  A169754, A169755, A169756, A169768

23

Trial Court: Alameda County Superior Court

Trial Judge: Hon. Rebekah Evenson

Counsel:

Baker & Hostetler LLP, Matthew C. Kane, Sylvia J. Kim, Amy E. Beverlin, Richard Raile; Dykema Gossett LLP, James S. Azadian, Charlotte G. Carne, James Azadian for Defendants and Appellants.

Boyamian Law, Inc., Michael H. Boyamian, Armand R. Kizirian for Plaintiff and Respondent.

*Betanco v. Living Spaces Furniture, LLC, et al.* A169754, A169755, A169756, A169768